**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,**

v.

**SALOMON INC. and Salomon Brothers Inc., Defendants,**

**Eric R. Rosenfeld, Claimant–Appellant.**

**No. 897, Docket 95–6190.**

United States Court of Appeals, Second Circuit.

Argued Dec. 18, 1995.

Decided March 7, 1996.

---

**803**

Before: KEARSE, MINER and PARKER, Circuit Judges.

MINER, Circuit Judge:

Claimant-appellant Eric R. Rosenfeld appeals from a judgment of the United States District Court for the Southern District of New York (Patterson, J.) upholding the determination of the administrator of a civil claims fund that Rosenfeld is ineligible to receive a payment from the fund. The district court found that it was reasonable for the administrator to exclude Rosenfeld from receiving a payment from the fund because of his participation in improper tax trading. For the reasons that follow, we vacate the judgment of the district court and remand this case to the district court with instructions to remand to the administrator of the civil claims fund for reconsideration.

## BACKGROUND

In May of 1992, plaintiff-appellee Securities and Exchange Commission ("SEC") brought a civil enforcement action against defendants Salomon Inc and Salomon Brothers Inc (collectively, "Salomon"), alleging that Salomon had violated provisions of the Securities Act of 1933, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. The SEC's complaint alleged, inter alia, that Salomon had engaged in improper tax trading by having created the false appearance that it had sustained $168 million of trading losses for income tax purposes.[1] This improper trading allegedly began in the fall of 1986 when Saul Rosen, the head of Salomon's tax department, asked Paul Mozer, a Salomon trader, to execute trades that would enable Salomon to recognize tax losses in short positions in its securities accounts. Mozer carried out a plan whereby he first would purchase U.S. Treasury securities from other firms in order to liquidate Salomon's existing short positions at a loss. Then, by prearrangement, Mozer would reestablish Salomon's original short positions by selling the securities back to the other firms. Salomon and the other

Randall W. Quinn, Washington, DC (Eric Summergrad, Diane V. White, Paul Gonson, Securities and Exchange Commission, Washington, DC, of counsel), for Plaintiff–Appellee.

Charles E. Davidow, Washington, DC (Lloyd N. Cutler, Jeffrey E. McFadden, Wilmer, Cutler & Pickering, Washington, DC, of counsel), for Claimant–Appellant.

1. In its complaint, the SEC also charged that Salomon had submitted false bids in auctions for U.S. Treasury securities between August of 1989 and May of 1991, and that it had falsified its books and records in connection with the bids.

firms would engage in compensatory trades to redress the effect of any intervening price changes in the securities, and Salomon also would pay a small commission to the other firms. Mozer undertook these trades using securities positions in accounts for which Rosenfeld, along with another Salomon trader, Lawrence Hilibrand, had primary responsibility. Because Mozer's trades were prearranged and did not require Salomon to assume any market risks, Salomon was not entitled to recognize losses for income tax purposes as a result of the transactions.[2]

On May 20, 1992, Salomon consented to the entry of a judgment (the "Final Judgment") that resolved the SEC's civil enforcement action. Under the terms of the Final Judgment, Salomon was ordered to pay $100,000,000 into a civil claims fund (the "Fund") which would be administered by a court-appointed fund administrator (the "Fund Administrator"). The Final Judgment directed that the Fund Administrator would have charge of the monies in the Fund and would determine the validity of claims for payment out of the Fund. The Final Judgment further provided that payments from the Fund would not be made to:

> any person or entity who is, or whose immediate family member is, a current or former officer, managing director, employee or stockholder of [Salomon] ... where the Fund Administrator finds, after consultation with the [SEC], that by reason of such person's participation in Salomon–Related Activities or such person's failure to supervise such activities, it would be inequitable or otherwise inconsistent with the purposes of [the Final Judgment] to permit such person or entity to receive payments from the Fund.

The term "Salomon–Related Activities" was defined to include "the activities of [Salomon] in connection with the allegations of the [SEC's complaint]," which included the

SEC's allegations that Salomon had engaged in improper tax trading in 1986.

One of the claims for which the Fund Administrator authorized payment was the settlement of a class action that had been brought on behalf of persons who purchased Salomon Inc securities during a period in 1991 (the "class period") when the market prices of those securities allegedly were artificially inflated due to misrepresentations and nondisclosures by Salomon Inc. The settlement of the class action provided that $54.5 million from the Fund would be used for the creation of a settlement fund (the "Settlement Fund") to be used for the benefit of class members.

Pursuant to the terms of the settlement, members of the class received notice of the settlement and were given an opportunity to exclude themselves from it. Class members were told that if they did not exercise their right to exclude themselves, they would be bound by the terms of the settlement and any claims they otherwise might have held against Salomon would be released. Class members also were notified, however, that even if they did not exclude themselves from the settlement, they still might not be entitled to receive payments from the Settlement Fund if the Fund Administrator determined that they were ineligible under the terms of the Final Judgment due to their participation in or failure to supervise Salomon–Related Activities.

Rosenfeld was a member of this plaintiff class. As a result of his employment at Salomon Brothers Inc. from 1984 until 1993,[3] Rosenfeld was a participant in several Salomon compensation plans that had purchased on his behalf over 203,000 shares of Salomon Inc securities during the class period. After the settlement of the class action suit, Rosenfeld, who had not excluded himself from the settlement, became a claimant for payment

---

**2.** Rosen testified that Salomon had established a rule that its positions in its accounts were to remain liquidated for at least 24 hours to ensure that Salomon would have incurred enough of a market risk to enable it legitimately to recognize any trade losses.

**3.** Rosenfeld worked at the government arbitrage desk at Salomon Brothers Inc from 1984 until August of 1991, and was a managing director beginning in 1989. From December of 1988 until August of 1991, he co-headed the government arbitrage desk. Rosenfeld thereafter served as the head of the government trading desk until his resignation in January of 1993.

from the Settlement Fund based on his beneficial interest in the securities.

In a memorandum dated January 30, 1995, the Fund Administrator determined that Rosenfeld, along with certain other individuals, was ineligible to receive payments from the Settlement Fund. In response, Rosenfeld's counsel submitted a brief to the Fund Administrator on March 31, 1995. The Fund Administrator considered Rosenfeld's brief along with transcripts of testimony by Rosenfeld, Hilibrand, and Mozer that previously had been taken before the SEC. In a letter to Rosenfeld's counsel dated April 21, 1995, the Fund Administrator stated: "Upon review of your briefs and further reading of various transcripts of testimony (see enclosures), I find that [Rosenfeld] ... participated in or failed to supervise Salomon–Related Activities described as 'improper tax trading'" in the SEC's complaint. Following a letter from Rosenfeld's counsel seeking further explanation, the Fund Administrator stated in an April 26th letter:

> I have concluded that sophisticated, experienced and qualified traders such as [Rosenfeld] must have known, to one degree or another, about Mr. Mozer's activities, which affected [his] trading strategies. Mr. Mozer in fact testified to that effect. In fact, [Rosenfeld was] in charge of the instrumentalities whereby Mr. Mozer did those acts referred to or described in the Complaint as Salomon–Related Activities. I have made no findings of moral opprobrium or criminality, but I read the Consent Judgment to require me to exercise common sense in denying [Rosenfeld] any benefit from the settlement upon which those acts were in part based, and for which acts [he] share[s] responsibility.

Rosenfeld's counsel requested the Fund Administrator to reconsider his determination, but, on May 3, 1995, the Fund Administrator declined to reverse his finding.

Rosenfeld then filed objections with the district court in accordance with procedures specified by the Fund Administrator. The SEC subsequently submitted a letter to the district court in support of the Fund Administrator's determination. On July 10, 1995, the district court upheld the Fund Adminis-

trator's determination. The district court found that "there is adequate support in the record for a finding that Mr. Rosenfeld was aware in 1986 that Mr. Mozer was pre-arranging the buy and sell of the short positions in his accounts with another party and that the determination of the Fund Administrator was reasonable." This appeal followed.

## DISCUSSION

### I. Interpretation of the Term "Participation" in the Final Judgment

The Final Judgment provides that payments from the Fund are not to be made to current or former employees of Salomon where "by reason of such person's *participation* in Salomon–Related Activities or such person's failure to supervise such activities, it would be inequitable or otherwise inconsistent with the purposes of [the Final Judgment] to permit such person or entity to receive payments from the Fund." (Emphasis added). The Fund Administrator found that Rosenfeld had participated in Salomon–Related Activities because he "must have known" about Mozer's improper tax trading in 1986. Although "[f]ew persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it," *Berger v. Heckler,* 771 F.2d 1556, 1576 n. 32 (2d Cir.1985) (alteration in original and quotation omitted), we interpret the terms of the Final Judgment *de novo.* See *Huertas v. East River Hous. Corp.,* 992 F.2d 1263, 1266 (2d Cir.1993) (holding that this court interprets settlement agreements *de novo*); *United States v. O'Rourke,* 943 F.2d 180, 186 (2d Cir.1991) (stating that the interpretation of a consent decree is subject to *de novo* review).

Rosenfeld argues that the Final Judgment's requirement of "participation" in Salomon–Related Activities cannot be satisfied solely by a person's knowledge of improper conduct. He contends that this court previously has used the word "participation" to describe affirmative action on the part of a person and not merely awareness of the action of others. *See, e.g., United States v. Heinemann,* 801 F.2d 86, 93–94 (2d Cir.1986)

(approving a jury charge that "mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient" for a person to be liable for conspiracy), *cert. denied,* 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987); *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938) (holding that in the context of liability for aiding and abetting, a defendant must "participate in [the crime] as in something that he wishes to bring about, that he seek by his action to make it succeed"); *see also Reves v. Ernst & Young,* 507 U.S. 170, 178, 113 S.Ct. 1163, 1170, 122 L.Ed.2d 525 (1993) (holding that under the Racketeer Influenced and Corrupt Organizations Act, the term "participate" as used in 18 U.S.C. § 1962(c) entails that a person have *"some* part in directing the enterprise's affairs"). Although the term "participation" may implicate more than knowledge, we think that knowledge, combined with the reviews and the conversations Rosenfeld had with Mozer, could constitute "participation." Indeed, in view of the equitable purpose of the Final Judgment to provide relief to the victims of Salomon's illegal activities, a broader interpretation of the word "participation" may be appropriate. *See Huertas,* 992 F.2d at 1267 ("[A] court may look to certain aids, such as the circumstances surrounding a settlement agreement's formation, when construing it for enforcement purposes.").

## II. Rosenfeld's Knowledge of the Improper Tax Trading

■ The Fund Administrator found that "sophisticated, experienced and qualified traders such as [Rosenfeld] must have known, to one degree or another, about Mr. Mozer's activities" and that "Mozer in fact testified to that effect." The Fund Administrator further stated that Rosenfeld was "in charge of the instrumentalities whereby Mr. Mozer did those acts referred to or described in the [SEC's complaint] as Salomon–Related Activities." The district court upheld the Fund Administrator's determination, the court having found that "there is adequate support in the record for a finding that Mr. Rosenfeld was aware in 1986 that Mr. Mozer was pre-arranging the buy and sell of the short positions in his accounts with another party." [4]

Although the Fund Administrator determined that Rosenfeld "must have known" about the improper tax trading, he did not support this determination with any findings of fact that demonstrate how Rosenfeld must have known of these activities. The Fund Administrator stated that he had "given credence to" Mozer's testimony, but the testimony itself was fuzzy with respect to Rosenfeld. For instance, Mozer's testimony before the SEC on November 1, 1993, referred to by the Fund Administrator, only shows that Mozer was uncertain as to whether Rosenfeld knew about the improper tax trading. Mozer testified as follows:

Q. By the way, back in 1986 the discussions about the tax trading, was [Rosenfeld] involved in those discussions?

A. I have a recollection that he was from time to time, because, as I said, you know, I think this took place over a number of days, and if [Hilibrand] were not present, let's say [Hilibrand] was on vacation, [Rosenfeld] was responsible for that book of business, so he would have had to have been involved.

This testimony by Mozer, however, does not indicate that Rosenfeld was involved in discussions relating to the improper aspects of the tax trading—namely, that there were prearrangements with other firms. Moreover, Mozer only speculated that Rosenfeld

4. The Final Judgment provides that "the Court shall determine whether payment of all or part of the claim is inconsistent with the terms or purposes of [the Final Judgment]." We think that this language suggests a lesser degree of deference to be accorded by the district court than that found to be appropriate in other consent decree cases, where the language is different. *See, e.g., United States v. International Bhd. of Teamsters,* 19 F.3d 816, 820 (2d Cir.) (administrator's decisions, to be reviewed under the same standard of review as is applicable to federal agency actions under the Administrative Procedure Act, are entitled to "great deference" in accordance with judgment provision), *cert. denied,* —— U.S. ——, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994); *United States v. International Bhd. of Teamsters,* 905 F.2d 610, 616–17 (2d Cir.1990) (same). In any event, for the reasons discussed, *infra,* we do not agree that "there is adequate support in the record" for the decision of the Fund Administrator.

"had to have been involved" because Rosenfeld would have been responsible if Hilibrand was not present.

Indeed, later in his testimony, Mozer again revealed his uncertainty as to whether Rosenfeld was aware of the improper tax trading:

Q. Okay. Now, let's back up to 1986. Who else knew about your arrangement with Jacobson [a trader at another firm] on those tax trades, other than yourself and Jacobson? Obviously, a couple of names come to mind, but I'd like to hear it from you.

A. Meriwether, Hillibrand [sic], *possibly Rosenfeld.*

. . . .

A. I would keep either [Hilibrand] *or* [Rosenfeld] *or* both abreast of what I was doing because it was their positions.

(Emphasis added). Although Mozer speculated that Rosenfeld may have been aware of his activities, Mozer did not state explicitly that Rosenfeld had knowledge of the improper tax trading.[5]

Rosenfeld's testimony before the SEC on April 22, 1992, does not reveal that he had any knowledge of the illegal tax trading. Rosenfeld testified as follows:

Q. Would you describe your involvement in the tax planning process whereby Salomon attempted to recognize losses near year end from the time you joined the firm?

A. In—I think the first time I became aware—well, what I can remember now is becoming aware of this in late 1986. I knew that our group was—had the responsibility of working with Saul Rosen in the tax department in terms of helping in any way we could with respect to Salomon's tax situation. I knew that in late 1986, [Mozer] was the point person.

Although Rosenfeld stated that he knew that Mozer was supposed to make trades for tax purposes, Rosenfeld did not indicate that he was aware of the prearrangements that made the trading improper. Indeed, Rosenfeld

testified that he never was consulted by Mozer regarding any trades that Mozer was making in Rosenfeld's accounts. Therefore, although the Fund Administrator referred to the "various transcripts of testimony" as support for his determination that Rosenfeld is ineligible as a claimant, none of the testimony in the record demonstrates that Rosenfeld knew about the improper tax trading.

Furthermore, even though the Fund Administrator found that a "sophisticated, experienced and qualified" trader such as Rosenfeld "must have known" about the improper tax trades, the Fund Administrator did not make any findings of fact that Mozer's illegal tax trades were made known in any way to Rosenfeld. Although the district court found that the Fund Administrator was "entitled to take judicial notice that traders on the government arbitrage account would keep a close eye on the daily trades in their accounts due to the possible effects of the daily trades on their trading positions and particularly on Mr. Mozer's daily trades in view of their size," the record is unclear as to how Rosenfeld would have been able to detect the illegal trades. The fact that, as the SEC claims, Mozer made more than 100 separate trades totalling more than $6.5 billion on at least 12 different days does not itself demonstrate knowledge on the part of Rosenfeld. In an affidavit, Rosenfeld stated that the daily reports he received indicated only the end-of-day positions in his accounts and did not show the purchases and sales of the securities that led to those positions. It is unclear whether Rosenfeld could have identified Mozer's transactions, and even if he were able to identify them, there is no evidence of any notice to Rosenfeld that the trades were improperly prearranged.

Under the terms of the Final Judgment, the Fund Administrator is empowered to make findings as to the eligibility of claimants to receive payments from the Fund. Because the Fund Administrator did not make the necessary findings to support his determination that Rosenfeld must have known of Salomon's improper tax trading

---

5. The SEC's questioning of Mozer on November 1, 1993 was not directed at determining Rosenfeld's involvement in the improper tax trades.

As a result, the SEC apparently did not further question Mozer as to Rosenfeld's relationship to Mozer's improper activities.

and therefore was ineligible to receive Fund payments, we vacate the judgment of the district court. We remand this case to the district court with instructions to remand to the Fund Administrator for reconsideration of the issue of Rosenfeld's "participation in Salomon–Related Activities."

## CONCLUSION

The judgment of the district court is vacated, and this case is remanded to the district court in accordance with the foregoing.