COUNTY OF SUFFOLK, a municipal corporation, and Robert Alcorn, Christopher S. George, Fred Harrison, Peter Maniscalco, William F. Quinn, Robert Hoffman, Susan Chase, Yolanda Owens, James Roth, Myra Berkoff and Sandra Rosenberg on behalf of themselves and other similarly situated, Plaintiffs,

v.

LONG ISLAND LIGHTING COMPANY, Stone & Webster Engineering Corp., Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis, and Andrew W. Wofford, Defendants,

and

Marketspan Corp., Intervenor– Defendant.

No. CV 87–0646.

United States District Court, E.D. New York.

March 9, 2000.

Judith P. Vladeck, Karen Honeycutt, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff-class members.

United States Attorney Loretta Lynch, by Igou M. Allbray, Assistant United States Attorney, Brooklyn, NY, for the United States Government.

Michael Lesch, Leboeuf, Lamb, Greene & MacRae, L.L.P., New York City, for intervenor-defendant.

Cynthia R. Clark, Keyspan Corporation d/b/a Keyspan Energy, Brooklyn, NY, for intervenor-defendant.

## MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER, AND JUDGMENT

WEINSTEIN, Senior District Judge.

TABLE OF CONTENTS

 I INTRODUCTION ................................................................................................ 189
 II FACTS ................................................................................................................ 189
 III JURISDICTION ................................................................................................ 191
 IV INTERPRETATION OF THE STIPULATION ................................................ 192
 V STATUTE OF LIMITATIONS .......................................................................... 195
 VI LAW OF THE CASE .......................................................................................... 195
 VII INTEREST .......................................................................................................... 196
VIII ATTORNEYS' FEES .......................................................................................... 196
 IX CONCLUSION .................................................................................................... 196

## I INTRODUCTION

The Class seeks a declaration interpreting the judgment and stipulation of settlement of a RICO class action and False Claims action ("Stipulation"). *See County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428, 1452–66 (E.D.N.Y.1989) (Stipulation appended). It contends that the Long Island Lighting Company and its successors, including Keyspan Corporation ("LILCO"), are required to pay the Class approximately $21.5 million more than LILCO intends to pay. Additionally requested are interest on past due amounts and attorneys' fees.

LILCO responds that the $21.5 million is being provided to ratepayers in the form of reduced taxes on their electric bills. Essentially, LILCO contends that the tax benefits reaped by the Class as a result of rate reductions resulting from the RICO class action are appropriately included in the $390 million aggregate settlement LILCO agreed to pay.

The Class is entitled to the relief it seeks.

## II FACTS

A decade ago LILCO was in serious financial trouble as a result of its construction of the Shoreham nuclear power plant. Ratepayers had brought a class action alleging that LILCO and those associated with it had fraudulently obtained rate increases from the New York State Public Service Commission (PSC) by making deliberate misrepresentations to the PSC respecting Shoreham. Extensive litigation followed. *See, e.g., County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428 (E.D.N.Y.1989) [*LILCO I*] (approving settlement); *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1487 (E.D.N.Y.1989) [*LILCO II*] (final judgment); *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1387 (E.D.N.Y. 1989) (dismissing claims by Suffolk County), *aff'd as modified*, 907 F.2d 1295 (2d Cir.1990); *County of Suffolk v. Long Island Lighting Co.*, 685 F.Supp. 38 (E.D.N.Y.1988) (standing to bring suit); *see also County of Suffolk v. Long Island Lighting Co.*, 14 F.Supp.2d 260 (E.D.N.Y. 1998) (rejecting modifications of Stipulation to allow acceleration of payments); *County of Suffolk v. Long Island Lighting Co.*, Civ. No. 87–0646, 1995 WL 761828 (Dec. 19, 1995) (extending life of Citizens Advisory Panel), *aff'd sub nom, County of Suffolk v. Stone & Webster Engineering Corp.*, 106 F.3d 1112 (2d Cir.1997) [*LILCO III*].

Faced with the substantial possibility that it would be liable to pay a judgment for billions of dollars—resulting in bankruptcy—LILCO settled the suit. LILCO agreed to pay "the sum of Three Hundred Ninety Million Dollars ($390,000,000) in the form of (i) rate reductions, and (ii) payments to Former Ratepayers." Stipulation ¶ 2(a). The $390 million figure was arrived at after intense negotiations by the parties with the aid of the court-appointed Special Master.

Payments were to be made over a ten year period, with the largest payments ballooning in the latter years. The amount and terms of the payments were fixed at a level that it was believed the stock and capital markets would recognize as reasonable, thus avoiding further injury to LILCO's financial standing. There was a concern that setting the aggregate settlement payment too high would result in a "boomerang effect," that is to say, a higher settlement would have unsettled the financial markets causing LILCO to pay exorbitant interest on needed loans, in turn requiring LILCO to charge higher electric rates to cover these costs. As the decision approving the settlement put it:

> higher payments in the RICO settlement would present a serious danger to LILCO by threatening investor confidence in the financial health of the utility. This would lead to higher interest rates if LILCO's bonds were not certified as of investment quality. The higher interest rates would, in turn, under standard PSC practice, be charged back to ratepayers as allowable utility costs. These additional costs would then, the experts for the PSC concluded, more than outweigh any increased level of payments above the schedule set out....

*LILCO I,* 710 F.Supp. at 1434.

The settlement worked. LILCO has prospered.

The Stipulation, settlement and judgment are specific about the amount that was to be paid by LILCO to ratepayers.

> LILCO shall pay to the Ratepayer Class ... the sum of Three Hundred Ninety Million Dollars ($390,000,000) in the form of ... rate reductions....

(Stipulation ¶ 4(a)).

The annual rate reductions required by the Stipulation shall be accomplished in accordance with the following schedule, commencing on the month and date indicated:

June 1990 —— $20 million
June 1991 —— $20 million
June 1992 —— $20 million
June 1993 —— $30 million
June 1994 —— $30 million
June 1995 —— $40 million
June 1996 —— $50 million
June 1997 —— $60 million
June 1998 —— $60 million
June 1999 —— $60 million
**[Total = $390 million]**

(Stipulation ¶ 4(d)).

Instead of paying the sums due under the schedule, LILCO has paid less, leading to a deficit that will amount to more than $21.5 million by May 31, 2000. The following table sets out the monthly installments made by LILCO, the resulting monthly tax "reduction," and the total monthly bill "reduction" to the Class.

**Class Settlement Amounts
Claimed as Payments by LILCO**

| | (1) Base Rate Reduction paid by LILCO | (2) Savings to Ratepayers from Revenue Tax Reductions | (3) Aggregate Reduction in Ratepayers' Utility Bills |
|---|---|---|---|
| Nov–90 | $ 1,390,068 | $ 70,932 | $ 1,461,000 |
| Dec–90 | 9,484,054 | 483,946 | 9,968,000 |
| Jan–91 | 3,085,552 | 157,448 | 3,243,000 |
| Feb–91 | 2,333,907 | 119,093 | 2,453,000 |
| Mar–91 | 1,927,638 | 98,362 | 2,026,000 |
| Apr–91 | 70,407 | 3,593 | 74,000 |
| May–91 | 950,499 | 48,501 | 999,000 |
| Jun–91 | 1,285,409 | 65,591 | 1,351,000 |
| Jul–91 | 1,784,920 | 91,080 | 1,876,000 |
| Aug–91 | 1,974,259 | 100,741 | 2,075,000 |
| Sep–91 | 1,960,938 | 100,062 | 2,061,000 |
| Oct–91 | 1,547,058 | 78,942 | 1,626,000 |
| Nov–91 | 1,231,176 | 62,824 | 1,294,000 |
| Dec–91 | 1,306,341 | 66,659 | 1,373,000 |
| Jan–92 | 1,521,369 | 77,631 | 1,599,000 |
| Feb–92 | 1,435,738 | 73,262 | 1,509,000 |
| Mar–92 | 1,332,981 | 68,019 | 1,401,000 |
| Apr–92 | 1,313,952 | 67,048 | 1,381,000 |
| May–92 | 1,278,749 | 65,251 | 1,344,000 |
| Jun–92 | 1,390,296 | 94,356 | 1,484,652 |
| Jul–92 | 1,865,948 | 126,638 | 1,992,586 |
| Aug–92 | 2,140,631 | 145,281 | 2,285,912 |
| Sep–92 | 2,289,847 | 155,407 | 2,445,254 |
| Oct–92 | 1,853,424 | 120,741 | 1,974,165 |
| Nov–92 | 1,302,066 | 84,823 | 1,386,889 |
| Dec–92 | 1,353,908 | 88,200 | 1,442,108 |
| Jan–93 | 1,581,749 | 96,001 | 1,677,750 |
| Feb–93 | 1,448,382 | 91,399 | 1,539,781 |
| Mar–93 | 1,420,471 | 87,766 | 1,508,237 |
| Apr–93 | 1,462,090 | 87,122 | 1,549,212 |
| May–93 | 1,309,568 | 78,033 | 1,387,601 |
| Jun–93 | 1,763,424 | 105,078 | 1,868,502 |
| Jul–93 | 3,005,860 | 185,806 | 3,191,666 |
| Aug–93 | 3,314,684 | 204,895 | 3,519,579 |
| Sep–93 | 3,390,447 | 209,579 | 3,600,026 |
| Oct–93 | 2,526,112 | 164,809 | 2,690,921 |
| Nov–93 | 1,951,237 | 127,304 | 2,078,541 |
| Dec–93 | 2,127,583 | 138,808 | 2,266,391 |
| Jan–94 | 2,468,220 | 161,033 | 2,629,253 |
| Feb–94 | 2,355,796 | 153,698 | 2,509,494 |
| Mar–94 | 2,308,631 | 150,621 | 2,459,252 |
| Apr–94 | 2,186,272 | 142,638 | 2,328,910 |
| May–94 | 1,959,254 | 127,826 | 2,087,080 |
| Jun–94 | 2,434,556 | 158,836 | 2,593,392 |
| Jul–94 | 3,366,900 | 219,664 | 3,586,564 |
| Aug–94 | 3,385,983 | 220,909 | 3,606,892 |
| Sep–94 | 3,207,401 | 209,259 | 3,416,660 |

| | (1) | (2) | (3) |
|---|---|---|---|
| Oct–94 | 2,416,663 | 157,669 | 2,574,332 |
| Nov–94 | 2,012,919 | 131,327 | 2,144,246 |
| Dec–94 | 2,132,676 | 139,141 | 2,271,817 |
| Jan–95 | 2,346,471 | 153,090 | 2,499,561 |
| Feb–95 | 2,227,501 | 145,327 | 2,372,828 |
| Mar–95 | 2,198,716 | 143,450 | 2,342,166 |
| Apr–95 | 2,045,118 | 133,428 | 2,178,546 |
| May–95 | 1,999,192 | 130,432 | 2,129,624 |
| Jun–95 | 2,637,161 | 172,055 | 2,809,216 |
| Jul–95 | 3,613,354 | 235,744 | 3,849,098 |
| Aug–95 | 4,225,647 | 275,691 | 4,501,338 |
| Sep–95 | 4,158,512 | 271,312 | 4,429,824 |
| Oct–95 | 2,977,377 | 194,251 | 3,171,628 |
| Nov–95 | 2,447,362 | 146,088 | 2,593,450 |
| Dec–95 | 2,587,733 | 154,467 | 2,742,200 |
| Jan–96 | 2,918,332 | 170,840 | 3,089,172 |
| Feb–96 | 2,876,073 | 168,366 | 3,044,439 |
| Mar–96 | 2,790,974 | 163,384 | 2,954,358 |
| Apr–96 | 2,622,888 | 151,347 | 2,774,235 |
| May–96 | 1,844,949 | 106,458 | 1,951,407 |
| Jun–96 | 3,531,894 | 203,799 | 3,735,693 |
| Jul–96 | 4,750,743 | 274,129 | 5,024,872 |
| Aug–96 | 5,017,629 | 289,529 | 5,307,158 |
| Sep–96 | 5,142,032 | 296,707 | 5,438,739 |
| Oct–96 | 3,916,519 | 227,945 | 4,144,464 |
| Nov–96 | 3,238,365 | 198,660 | 3,437,025 |
| Dec–96 | 3,434,210 | 210,675 | 3,644,885 |
| Jan–97 | 3,968,093 | 220,310 | 4,188,403 |
| Feb–97 | 3,659,697 | 203,187 | 3,862,884 |
| Mar–97 | 3,378,235 | 187,561 | 3,565,796 |
| Apr–97 | 3,340,028 | 186,184 | 3,526,212 |
| May–97 | 3,182,598 | 177,409 | 3,360,007 |
| Jun–97 | 4,116,406 | 229,462 | 4,345,868 |
| Jul–97 | 6,566,129 | 366,018 | 6,932,147 |
| Aug–97 | 6,679,112 | 372,315 | 7,051,427 |
| Sep–97 | 6,571,573 | 366,320 | 6,937,893 |
| Oct–97 | 5,248,007 | 292,541 | 5,540,548 |
| Nov–97 | 4,120,334 | 229,681 | 4,350,015 |
| Dec–97 | 4,440,821 | 247,546 | 4,688,367 |
| Jan–98 | 4,760,637 | 262,192 | 5,022,829 |
| Feb–98 | 3,870,932 | 213,191 | 4,084,123 |
| Mar–98 | 3,606,117 | 198,607 | 3,804,724 |
| Apr–98 | 3,570,156 | 198,614 | 3,768,770 |
| May–98 | 3,347,613 | 186,233 | 3,533,846 |
| Jun–98 | 4,282,842 | 243,502 | 4,526,344 |
| Jul–98 | 6,161,067 | 355,257 | 6,516,324 |
| Aug–98 | 6,615,889 | 382,089 | 6,997,978 |
| Sep–98 | 6,588,299 | 380,496 | 6,968,795 |
| Oct–98 | 5,027,545 | 276,332 | 5,303,877 |
| Nov–98 | 4,082,116 | 224,368 | 4,306,484 |
| Dec–98 | 4,159,222 | 228,606 | 4,387,828 |
| Jan–99 | 4,650,397 | 255,603 | 4,906,000 |
| Feb–99 | 4,125,261 | 226,739 | 4,352,000 |
| Mar–99 | 4,506,317 | 247,683 | 4,754,000 |
| Apr–99 | 3,961,274 | 217,726 | 4,179,000 |
| May–99 | 4,029,523 | 221,477 | 4,251,000 |
| Jun–99 | 4,870,310 | 267,690 | 5,138,000 |
| Jul–99 | 6,381,263 | 350,737 | 6,732,000 |
| Aug–99 | 6,283,629 | 345,371 | 6,629,000 |
| Sep–99 | 5,239,043 | 287,957 | 5,527,000 |
| Oct–99 | 4,381,194 | 240,806 | 4,622,000 |
| Nov–99 | 4,062,699 | 223,301 | 4,286,000 |
| Dec–99 | 4,502,525 | 247,475 | 4,750,000 |
| Jan–00 | 4,627,648 | 254,352 | 4,882,000 |
| Feb–00 | 4,135,688 | 227,312 | 4,363,000 |
| Mar–00 | 4,480,723 | 246,277 | 4,727,000 |
| Apr–00 | 3,937,577 | 216,423 | 4,154,000 |
| May–00 | 4,063,647 | 223,353 | 4,287,000 |
| Total | $370,078,951 | $21,409,129 | $391,488,080 |

The amounts making up the sums in columns (1) and (2) were not disclosed on the individual bills sent to ratepayers. The only amounts revealed to ratepayers were those comprising column (3); the reason is discussed in Part IV, *infra.* (The total amount in column (3) exceeds the $390 million as the result of the payment to current ratepayers of interest which had accrued on the undistributed escrowed amounts in the Former Ratepayer Fund. *See* Stipulation ¶ 5; *see also County of Suffolk v. Long Island Lighting Co.,* Civ. No. 87–0646, 1995 WL 761828, at *3 (E.D.N.Y.1995) (ordering portion of escrowed funds to be "remitted to LILCO for payment to ratepayers with the next installment of refunds payable to ratepayers.")).

## III JURISDICTION

■ As a threshold matter, LILCO contends that the filed-rate and primary jurisdiction doctrines bar the Class's motion. These contentions are rejected. The Class is not challenging the PSC's calculation of rates, a task committed to that state agency. It is seeking a judicial determination regarding LILCO's contractual obligations under the Stipulation. *See, e.g., Fulton Cogeneration v. Niagara Mohawk Power,* 84 F.3d 91, 97 (2d Cir.1996) ("The primary jurisdiction doctrine applies whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." (internal quotation marks omitted)); *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 21 (2d Cir.1994) ("[I]t is the judicial determination of a reasonable rate that the filed rate doctrine forbids.... As compared with the expertise of regulating agencies, courts do not approach the same level of institutional competence to ascertain *reasonable rates.*" (emphases added)).

Interpretation of the Stipulation does not require complex or specialized technical calculations. It depends upon a question of law appropriately answered by the court. *See, e.g., Kovarsky v. Brooklyn Union Gas Co.,* 279 N.Y. 304, 312, 18 N.E.2d 287 (1938) ("[W]here only questions of law are involved direct application for relief may be made to the court [rather than to the PSC].").

■ LILCO's related contention that the Class's motion is an improper collateral attack on the PSC's orders approving

the method of calculating rate reductions under the Stipulation is also without merit. The PSC does not have jurisdiction to determine LILCO's obligations under the Stipulation. LILCO agreed to submit disputes concerning the Stipulation to the exclusive jurisdiction of this court. The court retained continuing jurisdiction to enter orders to effectuate the Stipulation. *See* Stipulation ¶ 32 ("In the event of any dispute or disagreement with respect to the meaning, effect, or interpretation of the Stipulation ... the parties hereto agree that such dispute will be adjudicated *only in the District Court.*" (emphasis added)); *LILCO II,* 710 F.Supp. at 1487 (*"The court retains equitable jurisdiction* to supervise the operation of this decree." (emphasis added)).

■ To the extent that LILCO's obligation is contractual in nature, the Federal Constitution prevents the PSC from abridging the Class's contractual rights. *See* U.S. Const. art. I, § 10, cl. 1. ("No State shall ... pass any ... Law impairing the Obligation of Contracts[.]"); *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat) 518, 608–13, 4 L.Ed. 629 (1819); *see also* Part IV, *infra.*

## IV INTERPRETATION OF THE STIPULATION

The central issue is whether the Stipulation provides that LILCO *must itself pay* the $390 million in the form of rate reductions, or, as LILCO claims, it may use tax savings accruing to ratepayers in calculating the $390 million.

■ Because the Stipulation "constituted a contract, general principles of contract law must govern its interpretation." *Goldman v. Commissioner of Internal Revenue,* 39 F.3d 402, 405 (2d Cir.1994); *see Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.3d 481, 484 (2d Cir. 1999). The parties agreed in the Stipulation that it "shall be ... interpreted in accordance with the laws of the State of New York[.]" Stipulation ¶ 31. It is to

New York contract law that we turn for direction.

■■ When the contractual terms are clear and unambiguous, New York enforces the intent of the parties as gleaned from within the four corners of the agreement. *See Karafiol v. Karafiol,* 259 A.D.2d 522, 686 N.Y.S.2d 461, 462 (2d Dept.1999); Richard A. Lord, 11 *Williston on Contracts* § 32:5, at 412–24 (4th ed.1999) [hereinafter *Williston on Contracts* ]. "[A] party cannot create an ambiguity ... merely by 'urg[ing] different interpretations in the litigation.'" *Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.3d 481, 484 (2d Cir.1999); *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) ("The court is not required to find the language ambiguous where the interpretation urged by one party would 'strain[ ] the contract language beyond its reasonable and ordinary meaning.'" (changes in original)); *see also* E. Allan Farnsworth, 2 *Farnsworth on Contracts* § 7.8, at 257–62 (2d ed.1998) (ambiguity in contract language). Rather, "[t]he words and phrases used [are to] ... be given their plain meaning." *In re Duncan Macrae,* 249 A.D.2d 476, 671 N.Y.S.2d 530, 531 (2d Dept.1998); *see Restatement (Second) of Contracts* § 202(3)(a) (1979); *Williston on Contracts, supra,* § 32:3, at 408–10.

■ Where the terms have a plain meaning and the resulting interpretation of the contract is clear, the court must give effect to that interpretation as the assumed intention of the parties. *Cf. Hartford Accident & Indemnity Co. v. Wesolowski,* 33 N.Y.2d 169, 172, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973) ("The objective in any question of the interpretation of a written contract ... is to determine 'what is the intention of the parties as derived from the language employed.'" (internal citations omitted)).

■ LILCO argues that "[t]he Stipulation requires $390 million of rate reductions and the proper test is whether

ratepayers' bills were reduced by $390 million—not whether LILCO made out-of-pocket payments of $390 million." Defs' Res.Mem. at 28. The language of the Stipulation does not support such a reading.

The Stipulation is written in terms of LILCO's aggregate payment obligations, not in terms of the aggregate relief for the Class:

- *"LILCO shall pay* to [the Class] . . . the sum of Three Hundred Ninety Million Dollars ($390,000,000) in the form of . . . rate reductions. . . ." (Stipulation ¶ 2(a) (emphasis added)).
- *"LILCO shall pay* [the Class] a total of $390 million in the form of rate reductions over a period of 10 years." (Stipulation ¶ 4(a) (emphasis added)).

By the express terms of the Stipulation, the $390 million was the amount LILCO agreed it would "pay." In fact, the Stipulation uses "rate reduction" and "revenue reduction" interchangeably, further suggesting that LILCO was to shoulder the $390 million obligation from *its revenues*. *See* Stipulation ¶ 4(h) ("The above *revenue reductions* are the total amount that LILCO shall guarantee. . . ." (emphasis added)).

LILCO argues, in the alternative, that the term "rate reductions" as used in the Stipulation carries a specialized meaning and that this meaning should govern. In advancing this argument, LILCO relies on "rate reductions" as understood and calculated by the PSC.

The PSC includes not only the base rate reduction (e.g., the reduction borne by the utility from its revenues), but also any resulting reduction in gross taxes and surcharges as a result of the base rate reduction, in calculating "rate reductions." This practice results from New York state's prohibition on breaking out in utility bills base rates charged by the utility from taxes and surcharges levied by the government. It is designed, as revealed by LILCO during oral argument, to "hide"

from ratepayers the fact that a substantial portion of their electric bills consist of taxes and governmental surcharges.

As support for its contention that the PSC's specialized understanding of "rate reductions" should govern, LILCO notes that "[i]n proposing the $390 million settlement figure, the staff of the PSC [had] included the Revenue Taxes in its calculation of rate reductions." *See* Defs' Res. Mem. at 29.

The Stipulation itself, however, evidences no intent to use the PSC's understanding of "rates." In the first place, the Stipulation provides that LILCO "shall pay" the $390 million in rate reductions. The express obligation that LILCO pay the $390 million indicates LILCO alone was to assume the cost of the rate reductions. Since the state and local municipalities are bearing the cost of the reduced taxes and surcharges, by definition LILCO is not "paying" them. Applying the PSC's specialized understanding of "rate reductions" would effectively undermine LILCO's obligation to bear the cost of the reduced rates and therefore is not the natural meaning of the phrase "rate reductions" as used throughout the Stipulation.

That any tax advantage accruing to the Class from reduced taxes and surcharges owed state and local governments was not intended as part of the $390 million rate reduction is further evidenced by the fact that no part of the record (outside of the PSC's documents), nor any language in any of the settlement papers—including the Stipulation—intimate such an understanding. *See Tom Doherty Assoc. v. Saban Entertainment Inc.,* 869 F.Supp. 1130, 1140 (S.D.N.Y.1994) ("It is axiomatic that, in the absence of evidence to the contrary, words in a contract carry their plain meaning.").

 The term "rate reductions" as used in the Stipulation must be given its ordinary and common meaning, that is it must be understood as referring to reductions in the rate charged by LILCO. This conclu-

sion is particularly persuasive given that during the negotiations LILCO was apparently aware of the specialized industry meaning, had reason to know the Class's ignorance of this special meaning, and did not affirmatively clarify the usage it now asserts is controlling. *See, e.g., Frigaliment Importing Co. v. B.N.S. Int'l Sales Corp.*, 190 F.Supp. 116, 121 (S.D.N.Y.1960) (Friendly, J.) (contracting party asserting specialized meaning of term over plain meaning has burden of proof); *see also* E. Allan Farnsworth, *Contracts* 7.9, at 488–89 (1982). LILCO must be deemed to have assented to the only understanding of the phrase "rate reductions" shared by the parties. *See* Joseph M. Perillo, 1 *Corbin on Contracts* § 4.10, at 617 (rev. ed. 1993) ("If the meaning that either [party] . . . gave to the words was the only reasonable one under the existing circumstances, as the other party had reason to know, *the latter is bound by that meaning and there is a contract accordingly.*" (emphasis added)).

LILCO also suggests that the PSC's approval of its rates supports its contention that the tax advantages accruing to ratepayers may be counted towards its $390 million obligation. This argument misreads the reality of LILCO's contractual duty. Mere approval of LILCO's utility rates by the PSC cannot eliminate or reduce LILCO's independent affirmative obligation under the Stipulation to pay $390 million *out of its net revenues* to compensate Long Island ratepayers.

The PSC has no more power than LILCO to abrogate the agreement. In the absence of "a legitimate and important public purpose," the Federal Constitution prohibits states from substantially impairing contractual rights. *Mascio v. Public Employees Retirement System of Ohio*, 160 F.3d 310, 313 (6th Cir.1998); *see* U.S. Const. art. I, § 10, cl. 1; *Vesta Fire Ins. Corp. v. Florida*, 141 F.3d 1427, 1433 (11th Cir.1998) ("Three factors are considered when evaluating a claim that the Contract Clause has been violated: (1) whether the

law substantially impairs a contractual relationship; (2) whether there is a significant and legitimate public purpose for the law; and (3) whether the adjustments of rights and responsibilities of the contracting parties are based upon reasonable conditions and are of an appropriate nature."); *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) ("Despite the customary deference courts give to state laws directed to social and economic problems, '[l]egislation adjusting the rights and responsibilities of contracting parties must be upon *reasonable conditions and of a character appropriate to the public purpose justifying its adoption.*'" (emphasis added) (changes in original)); *County of Suffolk v. Long Island Lighting Co.*, 14 F.Supp.2d 260, 267–69 ("[LILCO] cannot offer even a rational basis for the redistribution of rights under the [Stipulation and] judgment."); *see generally Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat) 518, 607–13, 4 L.Ed. 629 (1819); John Edward Smith, *John Marshall: Definer of a Nation* 434–35 (1996) ("*Dartmouth College* is a pivotal case in American economic development. . . . It is, in some sense, the case of every man who has property of which he may be stripped. For the question is simply this: shall our State legislatures be allowed to take *that which is not their own,* to turn it from its original use, and apply it to such ends or purposes as they, in their discretion, shall see fit?" (emphasis in original) (quoting Daniel Webster)).

To the extent that LILCO's obligation to pay out-of-pocket the $390 million is contractual in nature, the state—whether directly through legislation or indirectly through the PSC—cannot impair the Class's contractual rights. *See, e.g., Educational Employees Credit Union v. Mutual Guaranty Corp.*, 50 F.3d 1432, 1438–40 (8th Cir.1995); *cf. Allied Structural Steel Co.*, 438 U.S. at 244, 98 S.Ct. 2716 (application of contract modification to nar-

row class of parties is factor in determining constitutionality of modification).

## V STATUTE OF LIMITATIONS

No statute of limitation problems are presented. The Stipulation created an ongoing contractual relationship contemplating, and providing for, potential delays in making the various installment payments. *See, e.g.,* Stipulation ¶ 4(f) (deficiency in any year); *id.* ¶ 6(c) (possibility of postponing installments for reasons of financial necessity).

■ The statute of limitations for a breach of LILCO's obligation to pay the $390 million does not begin to run until May 31, 2000, the date the last installment is due under the Stipulation. *Cf. City of New York v. Castro–Blanco, Piscioneri & Assoc., P.C.,* 222 A.D.2d 226, 228, 634 N.Y.S.2d 489 (3d Dept.1995).

## VI LAW OF THE CASE

■ Even assuming LILCO is correct that the Stipulation as drafted was designed to ensure that ratepayers' bills were reduced by $390 million, and not to require LILCO to make out-of-pocket payments of $390 million—an assumption impossible to support—, that "was effectively modified by the court as a condition of granting its approval of the settlement, and LILCO did not challenge that modification on appeal." *LILCO III,* 106 F.3d at 1117.

As the court of appeals explained in a related dispute over the interpretation of the Stipulation,

Although a consent decree is an agreement between the parties, it is nonetheless an accord that is not effective without approval of the district court. To the extent that the court imposes a condition that a party finds unacceptable, the party's recourse is either to retreat from the agreement, and continue the litigation or settlement negotiations, or to challenge the judicial condition on appeal within the time for appeal

from the judgment incorporating the condition. *A party that follows neither course will be barred from challenging the condition under the law-of-the-case doctrine.*

*Id.* at 1117 (internal citations omitted) (emphasis added).

In assessing the fairness and reasonableness of the parties' agreement and approving the Stipulation, the court interpreted it to mean that LILCO was obliged to pay fully the $390 million from its revenues. The court expressly stated, "[t]he *cost of the settlement to LILCO* is approximately 400 million dollars [—$10 million of which represented attorneys' fees—] over eleven years...." *LILCO I,* 710 F.Supp. at 1442 (emphasis added). Later in the same opinion the court stated, "[t]here is nothing in the agreement which would permit elimination of the *absolute obligation of LILCO to pay a total of $390 million* ... to the class." *Id.* at 1446 (emphasis added).

The court was entirely clear on the matter. LILCO must pay $390 million *out of its revenues* to the Class in the form of rate reductions.

"If LILCO objected to that interpretation, it should have moved for a modification of the court's opinion; and if no such modification were granted, it should have challenged the condition on appeal." *LILCO III,* 106 F.3d at 1117. LILCO did not contest this interpretation of the Stipulation either in the district court or in the court of appeals. *See, e.g., County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir.1990). In the absence of such a challenge, the court's interpretation "became the law of the case." *LILCO III,* 106 F.3d at 1117.

No basis in law or equity justifies a modification of this interpretation, even assuming the court possessed such authority. *See* Stipulation ¶ 6(c) ("[T]he District Court *shall not enter any order which reduces or has the effect of reducing the total $390 million dollar amount of rate*

*reductions agreed to.*" (emphasis added)). This conclusion is warranted in light of the repeated assurances in court opinions given to the ratepayers of Long Island—many of whom expressed extreme skepticism of LILCO's bona fides at the public fairness hearings held prior to the court's acceptance of the Stipulation—that LILCO would not be permitted to circumvent its "absolute obligation" to pay the $390 million. *See, e.g., LILCO I,* 710 F.Supp. at 1440 ("Other objectors felt that LILCO could not be trusted to carry out the settlement.").

## VII INTEREST

A substantial portion of the $21.5 million owing to the Class should have been paid in earlier installments. *See* Part II, *supra.* Interest shall be charged on the delinquent amount of each installment as of the last day of the month on which it should have been rebated to the ratepayers. The interest shall be calculated as provided for in the Stipulation. *See* Stipulation ¶ 4(f).

## VIII ATTORNEYS' FEES

Attorneys' fees and expenses are awarded to plaintiffs' counsel. *See* Stipulation ¶ 7 (fees for "administration of the settlement"). Fee and expense requests associated with prosecuting this declaratory judgment proceeding are to be submitted with full justification of hourly rates, time expended, and disbursements.

These fees will be paid out of the remaining funds set aside under the Stipulation for attorneys' fees. *See* Stipulation ¶ 7 (total fees shall not exceed $10 million).

## IX CONCLUSION

Plaintiffs' motion for a declaration of class rights is granted. Judgment is entered on behalf of the Class for the outstanding balance of the $390 million due as of May 31, 2000, plus interest, and attorneys' fees and expenses.

An order shall be submitted to the court in accordance with this memorandum with-in ten days. If the parties are unable to agree on the amounts due, including interest and fees, they shall arrange for a prompt evidentiary hearing before the court.

Costs and disbursements are to be paid by the defendants. These costs and disbursements are in addition to any fees, costs and disbursements provided for by paragraph 7 of the Stipulation.

SO ORDERED.