266 F.3d 131 (2nd Cir. 2001)
 COUNTY OF SUFFOLK, A MUNICIPAL CORPORATION, PLAINTIFF,
v.
ROBERT ALCORN, CHRISTOPHER S. GEORGE, FRED HARRISON, PETER MANISCALCO, WILLIAM P. QUINN, ROBERT HOFFMAN, SUSAN CHASE, YOLANDA OWENS, JAMES ROTH, MYRA BERZOFF AND SANDRA ROSENBERG, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-APPELLEES,
v.
LONG ISLAND LIGHTING COMPANY, STONE & WEBSTER ENGINEERING CORP., CHARLES R. PIERCE, WILFRED O. UHL, CHARLES J. DAVIS AND ANDREW W. WOFFORD, DEFENDANTS,
v.
MARKETSPAN CORPORATION, NOW KEYSPAN CORPORATION DOING BUSINESS AS KEYSPAN ENERGY, INTERVENOR-DEFENDANT-APPELLANT.
 Docket No. 00-7473
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: December 7, 2000
Decided September 28, 2001
 
 Appeal from a judgment in the United States District Court for the Eastern District of New York (Jack B. Weinstein, Judge) ordering KeySpan to pay damages for breach of a class action settlement. The court held that the settlement required appellant to pay the plaintiff class an additional $21 million, representing the tax savings to appellant resulting from its obligations under the settlement. We disagree and reverse.[Copyrighted Material Omitted]
 Guy Miller Struve, Davis Polk & Wardwell (James D. Liss, Kimberley D. Harris, and Laura Lopez, and Michael Lesch and Lorna McKenzie, LeBouef, Lamb, Greene & MacRae, L.L.P., New York, New York, and John E. Reilly and Cynthia R. Clark, Brooklyn, New York, of counsel), New York, New York, for Intervenor-Defendant-Appellant.
 Karen Honeycutt, Vladeck, Waldman, Elias & Engelhard, P.C. (Judith P. Vladeck and Julian R. Birnbaum, of counsel), New York, New York, for Plaintiffs-Appellees.
 Before: Oakes, Kearse, and Winter, Circuit Judges.
 
 Winter, Circuit Judge
 
 1
 MarketSpan Corporation, now KeySpan Corporation ("KeySpan"), appeals from Judge Weinstein's decision finding that it breached a class settlement agreement and awarding damages. See County of Suffolk v. LILCO, 87 F. Supp. 2d 187 (E.D.N.Y. 2000); County of Suffolk v. LILCO, No. 87-CV-0646 (E.D.N.Y. Apr. 3, 2000) (Corrected Final Order and Judgment); County of Suffolk v. LILCO, No. 87-CV-0646 (E.D.N.Y. Mar. 24, 2000) (Final Order and Amended Judgment).
 
 
 2
 The district court ruled that KeySpan's predecessor for all purposes relevant to this appeal, the Long Island Lighting Company ("LILCO"), had violated a 1989 Stipulation of Partial Settlement ("Settlement") of a RICO class action and false claims suit. The Settlement required that LILCO pay $390 million in the form of rate reductions to a class of electricity ratepayers. In the present proceeding, the class claimed that LILCO violated the terms of the Settlement because it paid $21 million less in New York state utility taxes as a result of the reduction in the ratepayers' electric bills pursuant to the Settlement. In the class's view, a rate reduction means a decrease in revenue to LILCO net of utility taxes. The class therefore argued that the $21 million in reduced taxes should have been added to the $390 million in the form of further rate reductions. The district court agreed. We reverse.
 
 BACKGROUND
 
 3
 The history of this litigation has been extensively detailed in previous opinions of the district court and this court, familiarity with which is assumed. See, e.g., County of Suffolk v. Stone & Webster Eng'g Corp., 106 F.3d 1112 (2d Cir. 1997) ("Stone & Webster"); County of Suffolk v. LILCO, 907 F.2d 1295 (2d Cir. 1990); LILCO, 87 F. Supp. 2d at 187; County of Suffolk v. LILCO, 14 F. Supp. 2d 260 (E.D.N.Y. 1998); County of Suffolk v. LILCO, No. 87-CV-0646, 1995 WL 761828 (E.D.N.Y. Dec. 19, 1995); County of Suffolk v. LILCO, 710 F. Supp. 1387, 1405, 1406, 1407, 1422, 1428, 1477, 1487 (E.D.N.Y. 1989); County of Suffolk v. LILCO, 122 F.R.D. 120 (E.D.N.Y. 1988); County of Suffolk v. LILCO, 685 F. Supp. 38 (E.D.N.Y. 1988). We therefore summarize only the facts relevant to the present appeal.
 
 
 4
 The underlying dispute arises from events that occurred as long ago as 1969, when LILCO announced plans to build a nuclear power plant at Shoreham, Long Island. In 1987, the County of Suffolk, a group of individual ratepayers, and a business corporation filed a class action suit alleging that, beginning in 1974, LILCO falsely portrayed the status of construction at Shoreham to the New York State Public Service Commission ("PSC"), the agency with authority to approve applications for rate increases. The gravamen of the complaint, which asserted claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), and New York common law, was that LILCO's false representations caused the PSC to grant the company unwarranted and excessive rate increases. See LILCO, 907 F.2d at 1299- 1300. A class was certified in February 1989, see Stone & Webster, 106 F.3d at 1114, and later that month, the parties entered into the Settlement, see LILCO, 710 F. Supp. at 1452-66.
 
 
 5
 The Settlement is a detailed, complex document. Given the district court's decision, we must quote much of that detail at length. Paragraph 2(a) of the Settlement provides:
 
 
 6
 LILCO shall pay to the Ratepayer Class... as hereinafter set forth in paragraphs 4, 5 and 6, the sum of Three Hundred Ninety Million Dollars ($390,000,000) in the form of (i) rate reductions, and (ii) payments to Former Ratepayers.[1]
 
 
 7
 Id. at 1456. Paragraph 4, which is titled "The Rate Reduction Plan," reads, in pertinent part:
 
 
 8
 Subject to the provisions of paragraphs 5 and 6 of this Stipulation, LILCO shall pay rate reductions provided for in this Stipulation as follows:
 
 
 9
 (a) LILCO shall pay the Ratepayer Class[2] a total of $390 million in the form of rate reductions over a period of 10 years (the "Rate Reduction Plan");
 
 
 10
 (d) The annual rate reductions required by this Stipulation shall be accomplished in accordance with the following schedule, commencing on the month and year indicated:
 
 June 1990----$20 Million
 June 1991----$20 Million
 June 1992----$20 Million
 June 1993----$30 Million
 June 1994----$30 Million
 June 1995----$40 Million
 June 1996----$50 Million
 June 1997----$60 Million
 June 1998----$60 Million
 June 1999----$60 Million
 
 11
 (e) The Rate Reduction Plan shall reduce rates to LILCO's ratepayers in proportion to the electric rate payments that would otherwise have been made by each ratepayer. The Rate Reduction Plan shall be an adjustment to individual twelve monthly electric bills. LILCO shall not seek any rate revenue which recovers any portion of the Rate Reduction Plan. LILCO will not attempt to obtain the sums listed above from its ratepayers.
 
 
 12
 (f) It is contemplated that each monthly bill will be reduced by a percentage calculated as the ratio of (i) the total dollar amount of the reduction to ratepayers for that year, divided by (ii) LILCO's anticipated revenue for that year as established in LILCO's rates filed before the PSC....
 
 
 13
 (g) To assure compliance with this paragraph, LILCO shall file appropriate tariffs with the PSC showing the method of adjusting individual bills as described above. LILCO also shall certify to the PSC in each rate application filed within the settlement period, and to the District Court and to Class Counsel and the Government's Counsel in each a monitoring report filed hereunder, that LILCO has not sought nor been provided with any rate revenue which recovers any portion of the rate reductions called for by this paragraph and that the rates LILCO seeks do not attempt to obtain the sums of the reductions from LILCO ratepayers....
 
 
 14
 (h) The above revenue reductions are the total amount that LILCO shall guarantee payment for all purposes covered by this Stipulation... except attorneys' fees, expenses and costs....
 
 
 15
 Id. at 1456-57. Paragraph 6 states, in relevant part:
 
 
 16
 Class Counsel and LILCO agree that it is in the best interests of LILCO ratepayers for LILCO to return to financial health at the least cost to ratepayers. The District Court will retain continuing jurisdiction over this settlement throughout the implementation of this Stipulation and Rate Reduction Plan to further the purposes to be served by this settlement.
 
 
 17
 ....
 
 
 18
 The District Court shall not enter any order which reduces or has the effect of reducing the total $390 million dollar amount of rate reductions agreed to.
 
 
 19
 Id. at 1457-58. Finally, paragraph 32 provides:
 
 
 20
 In the event of any dispute or disagreement with respect to the meaning, effect, or interpretation of the Stipulation... or in the event of a claimed breach of the Stipulation..., the parties hereto agree that such dispute will be adjudicated only in the District Court. The District Court shall retain jurisdiction for the purposes, among other things, of administering this settlement and resolving any dispute hereunder and awarding plaintiffs' counsel attorneys' fees and reimbursing their expenses.
 
 
 21
 Id. at 1465.
 
 
 22
 After the parties proposed the Settlement, the district court ordered hearings to determine whether its terms were fair and reasonable, pursuant to Fed R. Civ. P. 23(e).[3] Notice of the hearings was provided to nearly one million LILCO customers. Four hearings were held, two in Brooklyn, one in Nassau County, and one in Suffolk County. Hundreds of people attended, and the court offered additional time for briefing. See LILCO, 710 F. Supp. at 1432. In addition, an expert representing the class testified at the hearings that, based on his own studies and the studies performed by experts at the PSC, the Settlement was fair and reasonable. See id. at 1434. Experts also testified against the Settlement. All of the expert testimony was subject to full cross-examination.
 
 
 23
 The district court thereafter issued a lengthy opinion approving the Settlement. See id. The district court determined that the amount LILCO was required to pay under the Settlement -- the $390 million in rate reductions to the class plus approximately $10 million to be paid toward a legal fee fund -- was reasonable. See id. at 1442. The court approved the $400 million figure largely because it had been suggested by the PSC, following the court's request for advice from the PSC as to the maximum payment that LILCO could sustain without threatening investor confidence in LILCO's financial health. See id. We affirmed the district court's approval of the Settlement. See LILCO, 907 F.2d at 1299.
 
 
 24
 Over the course of the next eleven years, LILCO, and KeySpan as its successor, caused an aggregate reduction in the ratepayers' monthly utility bills of slightly more than $390 million, in accordance with the schedule set out in Settlement ¶ 4(d) and the formula established in Settlement ¶ 4(f). See LILCO, 87 F. Supp. 2d at 190. However, reductions in LILCO's gross receipts from the reduced utility bills resulted in roughly $21 million of tax savings to LILCO in Metropolitan Transit Authority and gross receipts taxes (collectively "GRT").
 
 
 25
 The GRT is imposed on utilities under New York law and is essentially based on the utilities' gross earnings. See N.Y. Tax L. § 186 (repealed 2000); N.Y. Tax L. § 186-a (amended 2000); N.Y. Tax L. § 186-b (repealed 2000); N.Y. Tax L. § 186-c. The law establishing the GRT states that it "shall constitute a part of the operating costs of such utility." N.Y. Tax Law § 186-a(6). The PSC must allow utilities to pass through reasonable operating expenses, like the GRT assessment, in the rates charged to consumers. See, e.g., Niagara Mohawk Power Corp. v. PSC, 69 N.Y.2d 365, 369-70 (1987). Utilities generally do this by imposing a PSC-approved revenue tax surcharge on consumers. See Brooklyn Union Gas Co. v. Comm'r of Taxation & Fin., 687 N.Y.S.2d 478, 480 (3d Dep't 1999). However, at all pertinent times,[4] New York law prohibited utilities from listing as a separate element on utility bills the portion representing the tax surcharge. See N.Y. Tax L. § 186-a(6) (pre-2000 version) ("The tax imposed by this section shall be charged against and be paid by the utility and shall not be added as a separate item to bills rendered by the utility to customers or others but shall constitute a part of the operating costs of such utility."). Thus, ratepayers, before and after the Settlement, received bills for electricity with totals that included, without mention, the GRT.
 
 
 26
 Of course, because the Settlement required that LILCO reduce its monthly bills, its gross earnings and revenue were also reduced, causing a reduction in the amount of GRT owed by LILCO (and of any other tax based on income). In each of the years in which rate reductions took place, LILCO, as required by Settlement ¶ 4(g), filed tariff amendments with the PSC showing the calculation of the rate reduction according to the formula set out in Settlement ¶ 4(f). In the first two years, the GRT was specifically included as a separate item in that calculation.
 
 
 27
 The Settlement also established a Citizens Advisory Panel ("CAP") to advise LILCO and the public on relevant issues, including the mitigation of rate increases. See Settlement ¶ 10. In 1998, while reviewing the budget of the Long Island Power Authority ("LIPA"), which had taken over LILCO, the CAP discovered that reduced rates also reduced the GRT surcharge on electric bills. Appellees then moved in the district court for an order that LILCO pay the class the amount it had saved in GRT as a result of the Settlement.
 
 
 28
 The district court granted the motion, holding that the Settlement contained an "express obligation" that "LILCO alone was to assume the cost of the rate reductions." LILCO, 87 F. Supp. 2d at 193. The court concluded that the term "rate reductions" in the Settlement was to be accorded its "ordinary and common meaning," id., rather than the "specialized industry meaning," id. at 194. In the court's view, the ordinary meaning of "rate reductions" is a rate decrease exclusive of the GRT, whereas the specialized meaning is a decrease inclusive of the GRT. The district court further held that LILCO's failure to challenge the court's stated understanding of the Settlement in 1989 -- that "'the cost of the settlement to LILCO is approximately 400 million dollars,'" id. at 195 (quoting LILCO, 710 F. Supp. at 1442) (emphasis and brackets omitted) -- rendered the court's interpretation the law of the case. Finally, the court granted the plaintiffs interest on the portion of the $21 million that was deemed owed to the class earlier as well as $83,643.75 in attorneys' fees and $8,465.22 for costs and disbursements, see Settlement ¶ 7 ("Reasonable attorneys' fees and litigation expenses to Class Counsel... and all costs of notice, publication and administration of the settlement shall be allocated by the District Court."). See LILCO, 87 F. Supp. 2d at 196. This appeal followed.
 
 DISCUSSION
 
 29
 a) Language of the Settlement
 
 
 30
 Each party claims that the plain language of the Settlement dictates a disposition in its favor.[5] KeySpan contends that the Settlement expressly stated that the rate reductions were to be calculated in accordance with standard PSC practice, which allows utilities to incorporate the GRT into rates. Appellees concede that "the GRT is paid by the utility and included in rates in the PSC- approved tariff meaning of that term." Appellees' Brief at 19, County of Suffolk v. LILCO (2d Cir. 2001) (No. 00-7473) (internal quotation marks omitted). However, they argue that the Settlement imposed an obligation on LILCO to bear a cost of $390 million. They further argue that the ordinary meanings of "rates" and "rate reductions" support their view. The district court agreed.
 
 
 31
 "Although few persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it," we review the district court's interpretation of the Settlement de novo. SEC v. Salomon Inc., 78 F.3d 802, 805 (2d Cir. 1996) (internal quotation marks and brackets omitted); cf. Bouzo v. Citibank, N.A., 96 F.3d 51, 58 (2d Cir. 1996) ("Under New York law, whether a written contract is ambiguous is a question of law that we review de novo."). However, we "review a district court's finding regarding the meaning of ambiguous terms for clear error, bearing in mind that where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." E.R. Squibb & Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154, 174 (2d Cir. 2001) (internal quotation marks and brackets omitted); see LILCO, 907 F.2d at 1326; cf. Settlement ¶ 32, (authorizing district court to resolve all disputes with regard to Settlement's meaning).
 
 
 32
 The parties do not dispute that New York law governs our interpretation of the Settlement. See Settlement ¶ 31. "Under New York law... if a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable." Care Travel Co. v. Pan Am World Airways, Inc., 944 F.2d 983, 987-88 (2d Cir. 1991) (internal quotation marks omitted).
 
 
 33
 When one examines the document, appellees' reliance on the supposedly ordinary meanings of "rates" and "rate reductions"[6] seems beside the point because the very detailed terms of the Settlement reveal the intended meaning beyond question. Importantly, appellees do not dispute that New York law requires the PSC to allow utilities to pass through the GRT to consumers or that the PSC's established practice has always been to include the GRT as an explicit element of an approved rate. Given that practice, the meaning of the Settlement is clear.
 
 
 34
 "Rates" is not defined in the Settlement but is given meaning in the definition of "rate reductions." The Settlement defines the "Rate Reduction Plan" as "LILCO's rate reductions and payments to Former Ratepayers provided for by paragraphs 4 and 5 of this Stipulation." Settlement ¶ 1(jj). Paragraphs 4 and 5 state, in relevant part, that "LILCO shall pay the Ratepayer Class a total of $390 million in the form of rate reductions," id. ¶ 4(a), and that the "Rate Reduction Plan shall reduce rates to LILCO's ratepayers in proportion to the electric rate payments that would otherwise have been made by each ratepayer," id. ¶ 4(e). The Settlement then goes on to provide a formula to calculate the rate reduction: "It is contemplated that each monthly bill will be reduced by a percentage calculated as the ratio of (i) the total dollar amount of the reduction to ratepayers for that year, divided by (ii) LILCO's anticipated revenue for that year as established in LILCO's rates filed before the PSC." Id. ¶ 4(f).
 
 
 35
 With regard to this ratio, ¶ 4(d) specifies the exact total reduction to be implemented each year, beginning with $20 million in the early years and ballooning to $60 million by 1999. The numerator of the ratio determining the monthly rate reduction is thus fixed by the Settlement. The denominator is to be determined based on "LILCO's anticipated revenue for that year as established in LILCO's rates filed before the PSC." Id. ¶ 4(f). As noted, it is agreed that the rates filed by LILCO and approved by the PSC expressly include the GRT, as they must under New York law. Therefore, the Settlement clearly defines "rate reductions" as the total amount reducing ratepayers' monthly bills determined by a ratio with a numerator fixed by the Settlement and a denominator to be calculated by filings with the PSC that specifically include the GRT as part of the rate. In short, to adopt the position taken by appellees and the district court would require us to hold that the calculation of rate reductions by the formula specified in Settlement ¶ 4(f) actually violates the Settlement.
 
 
 36
 The district court concluded otherwise based on Settlement ¶ 4(a)'s statement that "LILCO shall pay the Ratepayer Class a total of $390 million in the form of rate reductions." See LILCO, 87 F. Supp. 2d at 193. It viewed this language as a plain statement barring LILCO from enjoying the tax savings resulting from that obligation. However, no such meaning can be attributed to that language.
 
 
 37
 First, the words "in the form of rate reductions" plainly incorporate the Settlement's detailed description of how "rate reductions" are to be calculated, and that calculation includes the GRT. Second, the detailed formula provided in Settlement ¶¶ 4(d) and (f) would in any event trump any inference drawn from the general language "shall pay." It is axiomatic that courts construing contracts must give "'specific terms and exact terms... greater weight than general language.'" Aramony v. United Way, No. 00-7146, 254 F.3d 403, 413-14 (2d Cir. June 20, 2001) (quoting Restatement (Second) of Contracts § 203(c) (1981)); see id. ("Even where there is no 'true conflict' between two provisions, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate.") (internal quotation marks omitted).
 
 
 38
 Finally, the words "shall pay" followed by a specific dollar amount are ubiquitous to settlements, as is the consideration of tax consequences in arriving at settlement amounts. We know of no decision, save the district court's decision in this case, that would add to the dollar amount specified in a monetary settlement resultant tax savings, although any monetary settlement by a business will reduce its income and exposure to federal, state, and local taxes on that income. Moreover, some settlement amounts may be deductible, resulting in further tax savings.[7] The lack of any decision holding that the amount specified in a settlement is not the amount to be paid is due to the fact that all competent lawyers -- for plaintiffs and defendants -- take tax consequences into account before specifying a settlement amount. Cf. Duse v. IBM Corp., 252 F.3d 151, 153-54 (2d Cir. 2001). The plain meaning of "shall pay... $390 million" is, therefore, the opposite of that attributed to it by the district court.
 
 
 39
 The district court also relied upon an inference of deception by LILCO in negotiating the Settlement. Noting the PSC's standard practice of including the GRT as part of the rate, see LILCO, 87 F. Supp. 2d at 193, the court inferred that "during the negotiations LILCO was apparently aware of the specialized industry meaning [of "rate"], had reason to know the Class's ignorance of this special meaning, and did not affirmatively clarify the usage it now asserts is controlling." Id. at 194. Any such inference of deception is wholly unwarranted.
 
 
 40
 First, LILCO had no reason whatsoever to believe that class counsel was ignorant of a New York state statute that directly affected the cost of electricity to ratepayers and was a visible element of the PSC's rate-setting practices mandated by New York law, particularly in a case in which the principal issue involved those rate-setting practices. Because the GRT is explicitly stated to be "part of the operating costs of utilities," N.Y. Tax Law § 186-a(6), the PSC must, as a matter of law, allow utilities to pass it through in rates charged to consumers. See, e.g., Niagara Mohawk Power Corp. 69 N.Y.2d at 369-70. A legal requirement that a tax imposed on utilities be passed through in prices charged to consumers, therefore, is not some arcane administrative practice that gives the term "rate" a "specialized industry meaning" likely to escape the notice of counsel who have brought an action alleging fraud in ratemaking proceedings. Setting rates that cover reasonable operating costs is much of the essence of rate regulation. Indeed, because the PSC allowed inclusion of the GRT as an express surcharge within the final rate made that component far more visible than other allowable operating costs. Moreover, counsel was assisted by a highly qualified expert,[8] who was familiar with the standard (and legally mandated) PSC practice of charging ratepayers allowable costs. Finally, as noted, counsel for plaintiffs and defendants routinely factor tax considerations into settlement negotiations.
 
 
 41
 Second, contrary to the statement of the district court, neither class counsel nor their expert claim to have been ignorant of either the GRT or the PSC's legal obligation to allow LILCO to pass through the cost of that tax in rates charged to consumers. Rather, they claim that the omission of any discussion of it somehow led to their unexpressed (for nine years) belief that the Settlement did not allow LILCO to benefit from resultant tax savings. Given that the language of the Settlement clearly allowed LILCO to enjoy such benefits, those unspoken and baseless assumptions were not caused by any act or omission of LILCO.[9] And, if something needed to be clarified in the course of the negotiations leading to the Settlement, it was class counsel's assumptions that effectively read ¶¶ 4(d) and (f) out of the agreement.
 
 
 42
 Further, although the district court may not have been alerted to the existence of the GRT by either class counsel, their expert, or LILCO, it relied so heavily on the advice of the PSC that no one at the time would have had any reason to believe that express consideration of the GRT would have affected the outcome or that deception -- if deception as to the existence of a tax was feasible -- was necessary. Indeed, the record reveals that the district court's knowledge of the GRT would not have prevented approval of the Settlement.
 
 
 43
 Before the Settlement was approved, the district court sought the advice of the PSC and expressly told the parties that, with regard to the Rate Reduction Plan, "[i]f it doesn't work, the PSC says it's unworkable, we'll change it. I can tell you that for technical advice I'll probably rely on the PSC as to what is useful. I want that clear." It also stated in its fairness opinion: "Ratemaking is not for the court, nor for Suffolk County. It is entrusted to the PSC which must assume responsibility for arranging an appropriate balance of costs to be paid by LILCO, the state government, local government and ratepayers." 710 F. Supp. at 1445. Finally, because the court and the parties recognized the importance of returning LILCO to sound financial health, the district court asked the PSC to offer a calculation as to the maximum payment that LILCO could sustain. See 710 F. Supp. at 1442. It is undisputed that the PSC's calculation took the GRT savings to LILCO into account. The district court and the parties accepted that calculation.
 
 
 44
 b) Law of the Case
 
 
 45
 The district court alternatively held that, even if the Settlement "as drafted was designed to ensure that ratepayers' bills were reduced by $390 million, and not to require LILCO to make out-of-pocket payments of $390 million... that was effectively modified by the court as a condition of granting its approval of the settlement, and LILCO did not challenge that modification on appeal." 87 F. Supp. 2d at 195 (internal quotation marks omitted). In so ruling, the district court relied upon two sentences in its 1989 opinion approving the Settlement. These sentences, in relevant part, stated that "[t]he cost of the settlement to LILCO is approximately 400 million dollars," 710 F. Supp. at 1442, and that LILCO had "the absolute obligation... to pay [this sum]," id. at 1446. The district court held that these statements constituted a modification of the Settlement by the court which, in the absence of any objection from LILCO on direct appeal, became the law of the case. See 87 F. Supp. 2d at 195-96; United States v. Williams, 205 F.3d 23, 34 (2d Cir.), cert. denied, 121 S. Ct. 203 (2000) ("The law of the case doctrine is, at best, a discretionary doctrine which does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided.") (internal quotation marks omitted); see also Stone & Webster, 106 F.3d at 1116-17 (applying law of the case doctrine on earlier appeal). We again disagree.
 
 
 46
 While "[i]t is peculiarly within the province of the district court to determine the meaning of its own order," id. at 1117 (internal quotation marks and ellipses omitted), the district court's fairness opinion did not purport to modify LILCO's obligations under the Settlement, much less to negate the formula established in Settlement ¶ 4(f). The law of the case holding was, therefore, an abuse of discretion. See Stone & Webster, 106 F.3d at 1117 (reviewing court's interpretation of its own opinion and order for abuse of discretion).
 
 
 47
 The district court never hinted at an intent to modify the Settlement in the fairness opinion and even stated in its later 1998 opinion: "The method of calculating the rate reductions was an essential feature of the agreement because it determined the amount of LILCO's payments to the individual members of the Plaintiff class." 14 F. Supp. 2d at 270. Moreover, the reference in the 1989 opinion to "the cost... to LILCO" -- one phrase in an opinion occupying forty-eight pages in the Federal Supplement -- was explicitly based on the estimate provided by the PSC as to the maximum amount that LILCO could pay, see 710 F. Supp. at 1442 -- and did pay -- inclusive of the tax savings.
 
 
 48
 Unlike an earlier appeal in this matter in which we did apply the law of the case doctrine, here there was no notice to LILCO that the court believed that its statements constituted a radical modification of the Settlement's terms to which LILCO would have had to object on direct appeal. See Stone & Webster, 106 F.3d at 1117 (noting that "district court expressly stated that the settlement is interpreted by the court to permit extension of CAP's life") (internal quotation marks and brackets omitted); see also Williams, 205 F.3d at 34 (considering notice to party as a factor in whether the law of the case doctrine was applicable).
 
 
 49
 Finally, in the appeal from the 1989 fairness opinion, we did not view the Settlement as having been modified in the manner now suggested by the district court. Rather, we stated that the Settlement provided for "a schedule of payments totaling $390 million to the class over an eleven year period." 907 F.2d at 1321 (internal quotation marks and brackets omitted). Accordingly, the law of the case doctrine is inapplicable.
 
 CONCLUSION
 
 50
 We therefore reverse the decision of the district court including its award of fees and costs to appellees.
 
 
 
 NOTES:
 
 
 [1]
 "Former Ratepayers" are defined in the Settlement essentially to include persons and entities who were ratepayers on or before December 31, 1989, but not thereafter. See Settlement ¶ 1(u).
 
 
 [2]
 The "Ratepayer Class" is defined in the Settlement primarily to include all then and future ratepayers of LILCO as well as any persons or entities who were ratepayers between 1974 and 1989. See Settlement ¶ 1(ii).
 
 
 [3]
 "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed. R. Civ. P. 23(e).
 
 
 [4]
 The law has been changed as of 2000 and currently reads: "The tax imposed by this section shall be charged against and be paid by the utility and may be added as a separate item to bills rendered by the utility to customers. Upon request the utility shall furnish a statement of the amount of tax imposed by this section to its customers for bills rendered on or after January first, two thousand." N.Y. Tax L. § 186- a(6).
 
 
 [5]
 KeySpan additionally argues that the so- called "filed- tariff" or "filed- rate" doctrine barred the district court's review of the class's motion. In view of our disposition of this matter, we do not address this contention.
 
 
 [6]
 We by no means concede that appellees' view of the plain or ordinary meaning of these words is correct. At all pertinent times, ratepayers received a monthly bill that required payment of a total amount without separate "rate" and "GRT" figures. To the ordinary ratepayer, a "rate reduction" of $1 would mean a bill of $1 less, not a bill of $1.10 less, the 10 cents being tax savings. Indeed, the New York law forbidding mention of the GRT in utility bills appears to have been designed to cause ratepayers to believe just that.
 
 
 [7]
 The only functional difference between the GRT and other taxes on income is that the GRT is roughly speaking a percentage of gross revenue from utility bills and not subject to deductions or adjustments. For political reasons, utilities prefer to treat the GRT as a surcharge, a preference stymied in part by the earlier law preventing it from being listed as such on ratepayers' monthly bills.
 
 
 [8]
 Appellees' expert had worked exclusively in the electric utility industry for years, and "[f]or the past quarter of a century, [has] monitored, analyzed and worked to influence the planning and performance of the Long Island Lighting Company...." The expert has written numerous books on energy issues, consulted for two Congressional agencies, the U.S. Department of Energy, and governmental agencies of 21 states, including New York, and presented expert testimony approximately a hundred times, at least one- fifth of them before utility commissions.
 
 
 [9]
 An inference of deception is also unwarranted in light of the public nature of the process followed in approving the Settlement. As the district court noted in its 1989 fairness opinion, "[s]eldom has there been as extensive an opportunity to be heard at Rule 23 hearings." 710 F. Supp. at 1441. In addition to extensive briefing, four hearings were held at which testimony was taken and cross- examination offered.