106 F.3d 1112
 COUNTY OF SUFFOLK, a municipal corporation, Plaintiff,
Robert Alcorn, Christopher S. George, Fred Harrison, Peter
Maniscalco, William P. Quinn, Robert Hoffman, Susan Chase,
Yolanda Owens, James Roth, Myra Berzoff, and Sandra
Rosenberg, on behalf of themselves and others similarly
situated, Plaintiffs-Appellees,
v.
STONE & WEBSTER ENGINEERING CORP., Charles R. Pierce,
Wilfred O. Uhl, Charles J. Davis, and Andrew W.
Wofford, Defendants,
Long Island Lighting Company, Defendant-Appellant.
 No. 112, Docket 96-7127.
 United States Court of Appeals,
Second Circuit.
 Feb. 11, 1997.
 
 Michael Lesch, New York City (John G. Nicolich, LeBoeuf, Lamb, Greene & MacRae, New York City; Leonard P. Novello, Cynthia R. Clark, Hicksville, NY, on the brief), for Defendant-Appellant.
 Karen Honeycutt, New York City (Judith P. Vladeck, James D. Esseks, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, on the brief), for Plaintiffs-Appellees.
 Before: MESKILL, KEARSE, and MAHONEY*, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendant Long Island Lighting Company ("LILCO") appeals from an order of the United States District Court for the Eastern District of New York, Jack B. Weinstein, Judge, amending a 1989 consent judgment by extending the life of, and continuing funding for, a Citizens Advisory Panel ("CAP") established pursuant to the judgment. On appeal, LILCO contends principally that the order impermissibly modifies its 1989 settlement agreement without its consent. For the reasons below, we affirm the order of the district court.
 
 I. BACKGROUND
 
 2
 The background of this litigation has been described previously in County of Suffolk v. Long Island Lighting Co., 710 F.Supp. 1428, 1451 (E.D.N.Y.1989) ("LILCO I "), aff'd in part, reversed and remanded in part, 907 F.2d 1295 (2d Cir.1990) ("LILCO II "), in LILCO II, 907 F.2d at 1299, and in opinions cited in both, see id. n. 1; LILCO I, 710 F.Supp. at 1432, familiarity with which is assumed. Briefly, LILCO, a regulated utility serving Long Island, New York, announced in 1969 its plan to construct at Shoreham, Long Island, an 820-megawatt nuclear power plant ("Shoreham"), to be completed by 1975 at an estimated cost of $217 million. In 1989, after costs had exceeded $5 billion, without completion of the project, LILCO reached an agreement with New York State to cancel Shoreham.
 
 
 3
 In the meantime, beginning in 1974, LILCO had sought and gained customer rate increases based, in part, on Shoreham's construction costs, notwithstanding a state regulatory principle that customers are generally to be charged only for plants that are in operation. The present ratepayer litigation eventually ensued, and a class was certified in February 1989 comprising the County of Suffolk (the "County") and all persons who had been LILCO ratepayers at any time since January 1, 1974, who were LILCO ratepayers in 1989, or who would be LILCO ratepayers in the future.
 
 
 4
 Shortly thereafter, LILCO and the class representatives entered into a tentative Stipulation of Partial Settlement dated February 27, 1989 ("Stipulation" or "settlement agreement"), that included a requirement that LILCO refund to the class a total of $390 million over an 11-year period. In addition, a fund of up to $10 million was to be created for legal and related costs (the "legal fee fund"), and CAP was to be created to represent ratepayers' interests in the implementation of the settlement. The settlement agreement stated that "[t]he period of the Citizen Advisory Panel's existence shall be five years, subject to extension by party agreement." Stipulation p 10, Exhibit 1 to LILCO I, 710 F.Supp. at 1459. The agreement authorized the district court to resolve "any dispute or disagreement with respect to the meaning, effect, or interpretation of the Stipulation." Id. p 32, 710 F.Supp. at 1465.
 
 
 5
 After holding fairness hearings, the district court approved the proposed settlement. See LILCO I, 710 F.Supp. at 1451. In assessing fairness, the court noted that the settlement consisted of "five main elements," including
 
 
 6
 1) a schedule of payments [totaling $390 million] to the class over an eleven year period, with limited power of the court to defer or accelerate payments upon application by a party; 2) a fund of up to ten million dollars for legal and related costs; [and] 3) organization of a Citizens Advisory Panel to assist the class and LILCO over the next five years, which is interpreted by the court to permit extension until all payments are made (with availability of portions of the $10 million legal fee fund for aid of the panel as permitted by the court).
 
 
 7
 Id. at 1433 (emphasis added). The court further stated that
 
 
 8
 [t]he [legal fee] fund will also be used to pay legal and expert fees and related costs of the Citizens Advisory Panel provided for by the settlement agreement. This Panel should be of considerable assistance over its guaranteed life of five years to both LILCO and ratepayers. Upon application to the court the life of this body can be extended until the agreement is fully complied with. Both the recommendation for extending the life of the panel and for using the legal fund to pay legal, expert and other costs of attorneys and others to protect the class were made at the fairness hearings.
 
 
 9
 Id. at 1447. Final judgment was entered stating that "[t]he settlement agreement dated February 27, 1989, is approved as interpreted by this court's [opinion in LILCO I]." Final Judgment p 2, reported at 710 F.Supp. 1487. The Judgment also provided that "[t]he court retains equitable jurisdiction to supervise the operation of this decree." Id. p 9.
 
 
 10
 There followed various appeals and cross-appeals which, except for the County's contention that it should have been awarded attorney's fees, were unsuccessful. LILCO challenged some of the district court's interpretations of the settlement agreement. See LILCO II, 907 F.2d at 1325. We rejected LILCO's challenges, noting the settlement agreement's "express[ ] authoriz[ation] for the district court to resolve 'any dispute ... with respect to the meaning' of the agreement," id. at 1326 (quoting Stipulation p 32), and ruling that since the district court's interpretations were "not clearly contradicted by the settlement language or any other record evidence," those interpretations, in the absence of clear error, were entitled to deference, id. The district court's interpretation of the settlement agreement's provisions with respect to the life of CAP, as permitting the court to extend CAP's existence until all payments were made, was not challenged by LILCO on that appeal.
 
 
 11
 On remand from LILCO II, following a hearing, the district court issued an Order Amending Stipulation of Partial Settlement With Respect to Certain Dates and Providing for Payment of Attorneys' Fees, Disbursement and Costs, dated November 15, 1990 ("LILCO III "), awarding the County $7.7 million in attorneys' fees. Combined with the $1,955,636 in administrative expenses and other fees, this award left only $344,364 in the account from which class counsel fees and the expenses of CAP were to be paid. LILCO III at 4. The court ordered that the $344,364 be transferred to a new fund (the "Administration Fund"); and to supplement that amount, the court ordered LILCO to add $503,000 to the Administration Fund. The latter sum consisted of interest resulting from a six-month delay in implementing both the first annual ratepayer rate reduction plan and the former-ratepayer escrow fund, which were mandated by the settlement. Id. at 5. LILCO did not appeal the modifications ordered in LILCO III, and hence did not challenge the district court's order requiring it to transfer moneys from the former-ratepayer fund to the new fund for the financing of CAP.
 
 
 12
 In November 1995, CAP wrote to the district court, noting that CAP's initial five-year term was about to expire and urging that its existence be extended. CAP pointed out that in LILCO I the court had stated (a) that one of the main elements of the settlement was the "organization of [CAP] to assist the class and LILCO over the next five years, which is interpreted by the court to permit extension until all payments are made," and (b) that "[u]pon application to the court the life of this body can be extended until the agreement is fully complied with." (CAP letter to court dated November 13, 1995, at 1, 2 (quoting LILCO I, 710 F.Supp. at 1433, 1447) (emphases in letter).) LILCO opposed, arguing that the settlement agreement stated that CAP's term of existence was only "subject to extension by party agreement" and hence could not be extended by the court without LILCO's consent.
 
 
 13
 In a Memorandum and Order dated December 19, 1995 ("LILCO IV "), following a hearing, the district court granted CAP's motion in part, extending its life for at least two years, with leave to apply for further extensions. The factors informing the court's decision included the facts that only $150 million of the $390 settlement amount had been credited to LILCO ratepayers, and $230 million more were to be paid over the next six years (the remaining $10 million, discussed below, had been earmarked for former ratepayers); that CAP had acquired a great deal of expertise in its initial five-year term and had performed capably in reducing LILCO rates through conservation; and that the extension of CAP's existence was strongly supported by government officials and public interest organizations. In addition, the court indicated its concern for the prospects of ratepayers entitled to refunds if CAP's life were not extended, noting that there had been intense official and public discussion of the potential breakup of LILCO, possibly without provision for payment of the agreed settlement amounts to ratepayers.
 
 
 14
 The court stated that it had the power to grant CAP's motion because, inter alia, in approving the settlement, the court had expressly reserved that power:
 
 
 15
 The court has the power to extend the period of CAP's operations. This authority was explicitly reserved by the trial judge. 710 F.Supp. at 1433. Not only was this reservation not rejected on appeal, 907 F.2d at 1321, but the court of appeals specifically approved the trial court's reserved power to resolve " 'any dispute as to the meaning' of the agreement." Id. at 1326. Moreover, the final judgment reiterates in paragraph 9 that "the court retains equitable jurisdiction to supervise this decree." 710 F. Supp[. 1487] at 1487 (emphasis added).
 
 
 16
 LILCO IV at 5. The court also noted that if the dissolution of LILCO were to occur without provision for payment of the agreed settlement amounts to ratepayers, that development would constitute a change of conditions sufficient to justify the requested modification even if judicial power to extend CAP's life had not been expressly reserved. Id. at 5-6.
 
 
 17
 The court observed that the $10 million fund originally established for payments to former ratepayers--a purpose no longer current--had accumulated some $900,000 in interest. In contrast, in light of postjudgment events, it turned out that the account from which CAP was to have been financed had been underfunded. The court concluded that it would be equitable to use part of the accrued interest from the former-ratepayer fund to finance further operations of CAP:
 
 
 18
 Originally the court believed that a $10,000,000 fund would be available for CAP expenses. Payment of litigation costs to Suffolk County and to intervenors' attorn[ey]s have, however, exhausted this fund.
 
 
 19
 It seems eminently sensible to use unallocated interest from the fund for former ratepayers for CAP's work. This fund can no longer be used for its original purpose since time for this class of ratepayers to apply for refunds has long since expired. The interest is therefore a double "windfall."
 
 
 20
 LILCO IV at 7. The court ordered that CAP be financed from this fund at no more than $300,000 a year. The order also allowed CAP to budget its available moneys so as to extend its life beyond the two years provided by LILCO IV.
 
 
 21
 This appeal from LILCO IV followed.
 
 II. DISCUSSION
 
 22
 On appeal, LILCO, relying on the settlement agreement's language that CAP's existence would be five years "subject to extension by party agreement," contends principally that the district court had no power, without LILCO's consent, to extend CAP's term or to fund the extension with money that had been earmarked for return to former LILCO ratepayers. We reject LILCO's arguments, for even if the parties' settlement agreement unambiguously made the life of CAP subject to the whim of the parties, that term of the agreement was effectively modified by the court as a condition of granting its approval of the settlement, and LILCO did not challenge that modification on appeal.
 
 
 23
 Although a consent decree is an agreement between the parties, it is nonetheless an accord that is not effective without approval of the district court. See, e.g., United States v. ITT Continental Baking Co., 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975). To the extent that the court imposes a condition that a party finds unacceptable, that party's recourse is either to retreat from the agreement, and continue the litigation or settlement negotiations, or to challenge the judicial condition on appeal within the time for appeal from the judgment incorporating the condition. See, e.g., Berger v. Heckler, 771 F.2d 1556, 1567 (2d Cir.1985). A party that follows neither course, will be barred from challenging the condition under the law-of-the-case doctrine. Under that doctrine, a decision made at a previous stage of litigation, which could have been challenged in the ensuing appeal but was not, becomes the law of the case; the parties are deemed to have waived the right to challenge that decision, for "[i]t would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir.1981), cert. denied, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). Driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality, the law-of-the-case doctrine "applies ... to everything decided by necessary implication" in the first appeal. Id. at 108.
 
 
 24
 Here, in assessing the fairness and reasonableness of the parties' agreement and approving the settlement, the district court expressly stated that the settlement "is interpreted by the court to permit extension [of CAP's life] until all payments are made," LILCO I, 710 F.Supp. at 1433, and it entered the Final Judgment stating that the settlement was approved "as interpreted by th[e] court[ in LILCO I ]," Final Judgment p 2, 710 F.Supp. at 1487. The court's CAP-extension interpretation thereby became part of the Final Judgment. If LILCO objected to that interpretation, it should have moved for a modification of the court's opinion; and if no such modification were granted, it should have challenged the condition on appeal. Indeed, LILCO did make a post-LILCO I challenge to another of the district court's interpretations, see LILCO II, 907 F.2d at 1325, and it pursued that challenge on appeal. But LILCO did not timely challenge the CAP-extension interpretation. Other parties challenged the settlement as unfair, but this Court held that the district court's conclusion that the settlement was fair and reasonable was not an abuse of discretion. See LILCO II, 907 F.2d at 1323-25. The district court's interpretations of the settlement agreement in reaching its conclusion that the settlement was fair and reasonable were, by necessary implication, approved in LILCO II. When LILCO bypassed its opportunity in LILCO II to challenge the district court's interpretation with respect to extensions of CAP, that interpretation became the law of the case.
 
 
 25
 We are not persuaded by LILCO's apparent attempt to circumnavigate the law-of-the-case principle by arguing that LILCO I did not actually mean that the court retained the power to extend the life of CAP but meant only that if the parties themselves agreed to such an extension it would not be effective without approval by the court. We reject this argument as contrary to the district court's own interpretation of its opinion in LILCO I and of the Final Judgment. It is "peculiarly within the province of the district court ... to determine the meaning of its own order," Truskoski v. ESPN, Inc., 60 F.3d 74, 77 (2d Cir.1995) (per curiam) (internal quotation marks omitted), and even if we regarded the opinion or judgment as ambiguous, we would not disturb the issuing judge's interpretation absent a clear abuse of discretion, see id.; SEC v. Sloan, 535 F.2d 679, 681 (2d Cir.1976) (per curiam), cert. denied, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). The district court's LILCO IV interpretation of its reservation of power in LILCO I is entirely consistent with the language of LILCO I and of the Final Judgment, and we see no abuse of discretion.
 
 
 26
 In sum, the district court's LILCO I interpretation of the settlement agreement was incorporated into the Final Judgment, and that Judgment expressly preserved for the court equitable jurisdiction to supervise the operation of the settlement. LILCO's present characterization of the order entered in LILCO IV as making "modifications" of the Final Judgment is therefore erroneous. That order is instead an implementation of the terms of that Judgment.
 
 
 27
 Finally, we note that LILCO also contends, relying on In re "Agent Orange" Product Liability Litigation, 818 F.2d 179 (2d Cir.1987), cert. denied, 487 U.S. 1234, 108 S.Ct. 2899, 101 L.Ed.2d 932 (1988), that funding for CAP should not be extended because CAP engages in political activities. This contention is meritless for two reasons. First, given the nature of CAP's activity, LILCO's reliance on Agent Orange is misplaced. In that case, we disapproved of allocation of settlement proceeds to "activities inconsistent with the judicial function," 818 F.2d at 186, to wit, activities to "increas[e] public awareness of the problems of the class," id., a function we found to be beyond the scope appropriate to a personal-injury settlement. Here, in contrast, the activities of CAP on behalf of consumers, including monitoring rate increases and promoting energy conservation, have been "consistent with the nature of the underlying action," id., which was a suit for the charging of excessive rates. The Stipulation to which LILCO agreed stated that CAP would "study and advise LILCO and the public concerning ways to improve electric service, to mitigate rate increases, to control energy costs, and to assist ratepayers to conserve energy." Stipulation p 10, Exhibit 1 to LILCO I, 710 F.Supp. at 1459. Second, as LILCO must concede, the district court warned LILCO prior to approving the settlement that CAP "will have a life of its own," "it shall arrange for its own future membership and activities," and its members "will decide what they want to do themselves." (Hearing Transcript, February 24, 1989, at 59-60 (quoted in LILCO brief on appeal at 42).) LILCO neither objected in the district court nor challenged the structuring of CAP in its appeal in LILCO II. The independent nature of CAP therefore became the settled law of the case.
 
 CONCLUSION
 
 28
 We have considered all of LILCO's contentions on this appeal and have found them to be without merit. The order of the district court is affirmed.
 
 
 
 *
 The Honorable J. Daniel Mahoney, who was a member of the panel, died on October 23, 1996, and the appeal is being decided by the remaining two members of the panel, who are in agreement. See Local Rule § 0.14(b)