282 F.3d 103
 In re HOLOCAUST VICTIM ASSETS LITIGATION.
Jacob Friedman, on behalf of himself and all other persons of all national origins, ethnic groups, races, creeds and colors, similarly situated as victims and survivors of the Nazi Holocaust, Plaintiffs-Appellees,
v.
UBS AG, Credit Suisse Group, Defendants-Appellants.
 Docket No. 01-7531.
 United States Court of Appeals, Second Circuit.
 Argued January 16, 2002.
 Decided February 15, 2002.
 
 Stephen W. Preston (Roger M. Witten, Gregory S. Chernack, Christopher P. Simkins, on the brief), Wilmer, Cutler & Pickering, Washington, DC, for Defendants-Appellants.
 Burt Neuborne (Morris A. Ratner, Lieff, Cabraser, Heimann & Bernstein; Deborah Sturman, Milberg Weiss Bershad Hynes & Lerach, on the brief), New York, NY, for Plaintiffs-Appellees.
 Before: VAN GRAAFEILAND, CABRANES, and STRAUB, Circuit Judges
 PER CURIAM.
 
 
 1
 Defendants UBS AG and Credit Suisse Group ("Swiss Banks") appeal from an April 4, 2001 order entered on April 9, 2001 by the United States District Court for the Eastern District of New York that excluded certain Swiss corporate entities from receiving releases under a settlement agreement from further liability for having utilized slave labor during the Second World War.
 
 
 2
 * In a Memorandum and Order dated July 26, 2000, the District Court approved of the five settlement classes set forth in the Settlement Agreement. One such class was entitled "Slave Labor Class II," which included individuals who performed slave labor during the Second World War in businesses owned, controlled, or operated by companies based in Switzerland.[1] In that Memorandum and Order, the District Court announced that Swiss corporate entities, including those not party to the litigation, seeking to be released from further liability to members of Slave Labor Class II, must "identify themselves to the Special Master." In re Holocaust Victim Assets Litig., 105 F.Supp.2d 139, 162 (E.D.N.Y.2000). Failure to self-identify would result "in the denial of a release and permit those who have claims against those entities to pursue such claims independently of this lawsuit." Id. The Swiss Banks defendants objected to the self-identification requirement on August 4, 2000. Nevertheless, the self-identification requirement was incorporated in the District Court's Final Order and Judgment dated August 9, 2000, approving the Settlement Agreement. In re Holocaust Victim Assets Litig., No. 96-4849, at 1 (E.D.N.Y. Aug. 9, 2000). Defendants did not appeal the District Court's August 9, 2000 Final Order and Judgment.
 
 
 3
 On September 11, 2000, the Special Master, appointed by the District Court to develop a plan to implement the Settlement Agreement, filed his Proposal. The Special Master's Proposal stated in part: "Because Slave Labor Class II employers must have been Swiss-Owned during the War era, [many companies' subsidiaries] are not listed [on the table of entities seeking releases]" (the "Swiss-ownership requirement"). In re Holocaust Victim Assets Litig., Special Master's Proposal, Annex 1, Ex. 1 at 1 n. 2. On November 20, 2000, the District Court directed counsel for the Swiss Banks defendants to submit a letter addressing the Swiss-ownership requirement by December 19, 2000. Then, in a Memorandum and Order dated November 22, 2000, and before receiving the letter that the District Court had requested from defendants, the District Court adopted, in its entirety, the Special Master's Proposal to implement the Settlement Agreement. In re Holocaust Victim Assets Litig., No. 96-4849, 2000 WL 33241660, at *4 (E.D.N.Y. Nov. 22, 2000). Nonetheless, in a letter dated December 19, 2000, counsel for the Swiss Banks defendants responded to the District Court's November 20, 2000 request and clearly disputed the Special Master's interpretation of the Swiss-ownership requirement, which had been adopted by the District Court on November 22, 2000.
 
 
 4
 In an opinion dated April 4, 2001, the District Court issued a list of companies that "f[e]ll within the parameters of `Slave Labor Class II' as defined under the Settlement Agreement and as approved in [the] opinion of July 26, 2000." In re Holocaust Victim Assets Litig., No. 96-4849, 2001 WL 419967, at *1 (E.D.N.Y. Apr. 4, 2001). These companies had fulfilled the self-identification requirement set out by the District Court and were not excluded by the Swiss-ownership requirement as interpreted in the Special Master's Proposal. Accordingly, the Swiss Banks defendants filed a Notice of Appeal on April 24, 2001.
 
 
 5
 On appeal, defendants object to (1) the District Court's imposition of the self-identification requirement and (2) the District Court's interpretation of the term "Releasees" as used in the Settlement Agreement to exclude any Swiss corporate entity that acquired slave-labor-using companies after the Second World War and "which were owned or controlled by German or other non-Swiss entities" during the Second World War, id.
 
 II
 A. Timeliness
 
 6
 A party seeking to challenge a final order of a district court must file a notice of appeal within thirty days of the entry of the order being appealed. Fed.R.App.P. 4(a)(1). "This time limit is mandatory and jurisdictional." Olick v. Parker & Parsley Petroleum Co., 145 F.3d 513, 515 (2d Cir.1998) (citations omitted).
 
 (1) Self-identification requirement
 
 7
 The Swiss Banks defendants seek to appeal the District Court's April 4, 2001 decision, which applied the self-identification requirement imposed by the District Court's August 9, 2000 Final Order and Judgment, in which the Settlement Agreement was interpreted to exclude Swiss companies seeking a release under Slave Labor Class II that failed to identify themselves to the District Court.
 
 
 8
 Plaintiffs argue that defendants' appeal of the self-identification requirement is untimely because the requirement was clearly incorporated in the District Court's Final Order and Judgment of August 9, 2000. Plaintiffs assert that no appeal was taken from that judgment, and, accordingly, they assert that the defendants' Notice of Appeal, filed on April 24, 2001, is untimely. Defendants argue that no final decision had been rendered by the District Court's Final Order and Judgment of August 9, 2000 with respect to the self-identification requirement because the denial of releases based on failure to self-identify did not occur until the entry (on April 9, 2001) of the District Court's April 4, 2001 decision.
 
 
 9
 Under this Court's decision in County of Suffolk v. Stone & Webster Engineering Corp., 106 F.3d 1112, 1117 (2d Cir.1997) ("County of Suffolk"), we conclude that defendants' appeal is untimely. In County of Suffolk, the District Court modified a settlement agreement between the parties to allow for extension of the life of a citizens' oversight commission upon "application to the court." Id. at 1115. The consent decree was entered, and the defendant, a regulated utility, while appealing other issues, did not appeal the provision allowing for extension. Id. When the initial term of the citizens' oversight commission expired five years later, plaintiffs applied to the District Court for an extension. Id. The defendant objected, arguing that the original settlement agreement required the parties to come to agreement on extension of the commission's term. The District Court found that it had expressly reserved in its final judgment the power to extend the commission's life, upon application to the court, and, accordingly, rejected the defendant's arguments. Id. at 1116. This Court affirmed, concluding that defendant's objections were not timely, because it did not raise the issue in its appeal from the District Court's final judgment in which the consent decree had been approved. Id. at 1117.
 
 
 10
 The position of the Swiss Banks defendants is not materially different from that of the defendant in County of Suffolk. The District Court clearly imposed the self-identification provision on August 9, 2000 as part of its Final Order and Judgment approving the Settlement Agreement. The Swiss Banks defendants did not appeal the imposition of that self-identification requirement. Defendants argue that because the self-identification requirement was not applied to exclude Swiss corporate entities at the time the requirement was incorporated into the District Court's August 9, 2000 Final Order and Judgment, the self-identification requirement was not appealable at that time. Our holding in County of Suffolk is to the contrary, concluding that "if [the defendant] objected to [the] interpretation, it should have moved for a modification of the court's opinion; and if no such modification were granted, it should have challenged the condition on appeal." Id. Because the defendant did not appeal, we concluded that "[the District Court's] interpretation became the law of the case," and we rejected the defendant's appeal. Id. We conclude that the position of the Swiss Banks defendants here is in all relevant respects similar to that of the defendant in County of Suffolk and hold that the appeal of the self-identification provision by the Swiss Banks defendants is untimely.
 
 
 11
 For these reasons, the appeal is dismissed insofar as it concerns the challenge of the Swiss Banks defendants to the incorporation of a self-identification requirement for Swiss corporate entities seeking release under Slave Labor Class II.
 
 (2) Swiss-ownership requirement
 
 12
 In a Memorandum and Order dated November 22, 2000, the District Court adopted the Special Master's Proposal, which stated, in relevant part, that "[b]ecause Slave Labor Class II employers must have been Swiss-Owned during the War era, [many companies' subsidiaries] are not listed [on the table of entities seeking releases]." The Swiss Banks defendants did not appeal the November 22, 2000 Order. However, on November 20, 2000, two days before the District Court's adoption of the Special Master's plan, the District Court directed that counsel for the Swiss Banks defendants submit a letter addressing the interpretation of the Swiss-ownership requirement by December 19, 2000. Accordingly, counsel for the defendants submitted a letter dated December 19, 2000 and argued that the Special Master's interpretation was in error. The District Court requested further explanation, and, pursuant to the District Court's direction, counsel for the defendants responded by letter dated February 16, 2001.
 
 
 13
 This Court has "found it appropriate to examine the timing and substance of [a] motion in order to determine whether it should be deemed to extend the time for appeal." Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 136 (2d Cir.2000). We have extended the time to appeal in cases in which the motion "cited no particular procedural rule," Northwestern Nat'l Ins. Co. of Milwaukee, Wisconsin v. Alberts, 937 F.2d 77, 81 (2d Cir.1991), and where the motion concerned "reconsideration of matters properly encompassed in a decision on the merits." Jones, 223 F.3d at 136.
 
 
 14
 In the particular circumstances before us, we construe the direction of the District Court on November 20, 2000 to defendants to submit a letter addressing the interpretation of the Swiss-ownership requirement by December 19, 2000, together with the defendants' letters of December 19, 2000 and February 16, 2001 as one motion for reconsideration under Federal Rule of Civil Procedure 60(b).[2] Cf. City of Hartford v. Chase, 942 F.2d 130, 133-134 (2d Cir.1991) (treating a motion filed under a local rule as a motion under Rule 59(e) since it was "as a practical matter the same thing as [a] motion[] for amendment of judgment...."); Fort Knox Music Inc. v. Baptiste, 257 F.3d 108, 111 (2d Cir.2001) ("While normally [relief under Rule 60(b)] is sought by motion of a party ... nothing forbids the court to grant such relief sua sponte."). The November 22, 2000 Memorandum and Order adopting the Special Master's interpretation of the Swiss-ownership requirement was issued two days after the District Court directed the Swiss Banks to submit a letter on the interpretation of the very same requirement by December 19, 2000. The District Court could not have considered the Swiss Banks' letter until it was received on or about December 19, 2000. The April 4, 2001 order was the first time the District Court explicitly ruled on the Swiss-ownership requirement since "approving" it on November 22, 2000 and receiving the Swiss Banks defendants' letter of December 19, 2000. After receiving the defendants' December 19, 2000 letter, the District Court directed the Swiss Banks to provide another response, and the Swiss Banks complied in a letter dated February 16, 2001. Both the December 19, 2000 and the February 16, 2001 letters from defendants' counsel clearly objected to the District Court's November 22, 2000 interpretation of the Swiss-ownership requirement.
 
 
 15
 Accordingly, under these particular circumstances, we construe the direction of the District Court on November 20, 2000, together with the defendants' December 19, 2000 and February 16, 2001 letters submitted in response to that request, as one motion for reconsideration under Rule 60(b). We conclude that the District Court's April 4, 2001 order disposed of that motion. Defendants' Notice of Appeal was filed on April 24, 2001. Because we interpret the defendants' Rule 60(b) motion as having been effectively "filed" on November 20, 2000, when the District Court ordered defendants to submit a letter on the interpretation of the Swiss-ownership requirement provision, we conclude that the defendants' Rule 60(b) motion was made within 10 days after the entry of the District Court's Memorandum and Order of November 22, 2000. Moreover, because that motion was not disposed of until the entry (on April 9, 2001) of the District Court's April 4, 2001 order, the defendants' April 24, 2001 Notice of Appeal was timely filed under Federal Rule of Appellate Procedure 4(a)(4)(A)(vi).[3]
 
 
 16
 B. The Merits of the Remaining Claim on the Swiss Banks' Appeal: Interpretation of the Swiss-Ownership Requirement
 
 
 17
 The interpretation of the terms of a contract is a question of law and is reviewed de novo. Tourangeau v. Uniroyal, Inc., 101 F.3d 300, 307 (2d Cir.1996) ("We review a district court's interpretation of a settlement agreement de novo, mindful that the consent decree is a contract between the parties, and should be interpreted accordingly.") (citations omitted).
 
 
 18
 We have held that "[t]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Krumme v. West-Point Stevens Inc., 238 F.3d 133, 138-139 (2d Cir.2000) (internal quotation marks omitted) (applying New York law). We conclude that the provisions concerning the Swiss-ownership requirement are ambiguous for the reasons stated below.
 
 
 19
 As discussed earlier, the central dispute we must resolve is whether the Settlement Agreement provides releases for affiliates that were based in Germany or other Axis countries during the Second World War, but that were acquired by the Swiss parent company after the Second World War (the "after-acquired affiliates"). The Settlement Agreement enumerates the Releasees, including Swiss-based Concerns and Owned or Controlled Affiliates.[4] The Settlement Agreement then provides two confusing exclusions whose interpretation is at issue:
 
 Exclusion I:
 
 20
 The term Releasees also excludes parent companies and other affiliates of Swiss-based Concerns that (1) before 1945 were headquartered, based, or incorporated in Germany or any other Axis country or other country occupied by an Axis country between 1933 and 1946, (2) were not Owned or Controlled Affiliates as defined herein, and (3) disguised the identity, value, or ownership of Cloaked Assets or used Slave Labor.
 
 
 21
 (Settlement Agreem. at 6.)
 
 Exclusion II:
 
 22
 A company shall not be deemed a Releasee by virtue of being an Owned or Controlled Affiliate if (1) the company was headquartered, based, or incorporated in Germany or any other Axis country or other country occupied by an Axis country between 1933 and 1946, and (2) the company's parent was a Swiss-based Concern established for the sole purpose of disguising the identity, value, or ownership of Cloaked Assets.
 
 
 23
 (Id.)
 
 
 24
 Relying upon the asserted plain language of the Settlement Agreement, the District Court concluded that Exclusion I applies to companies based in Axis countries during the Second World War but that were acquired by a Swiss parent company after the Second World War. The District Court does not state what language in the Settlement Agreement formed the basis for its conclusion. Element (1) of Exclusion I clearly utilizes such a time limitation based on the duration of the Second World War. To satisfy element (1) of Exclusion I, a company must be headquartered, based, or incorporated in an Axis country during the period of the Second World War. However, element (2) of Exclusion I incorporates no such explicit time period limitation. Element (2) merely provides that the corporate entities might be excluded if they "were not Owned or Controlled Affiliates as defined herein." It does not state that after-acquired affiliates are not Owned or Controlled Affiliates for the purpose of receiving a release under the Settlement Agreement. In addition, the definition of the term "Owned or Controlled Affiliate" in the Settlement Agreement does not require that a corporate entity be Swiss-owned or controlled during the Second World War in order to qualify for a release.[5] Nonetheless, the District Court held that the plain language of the Settlement Agreement required such a reading, and apparently concluded from this that corporate entities "were not Owned or Controlled Affiliates as defined herein" if the Swiss-based parent acquired ownership or control after the Second World War.
 
 
 25
 The defendants, relying on the Settlement Agreement's ambiguity, argue that the District Court's interpretation of Exclusion I to impose such a time-period limitation frustrates the intent of the Settlement Agreement—namely, to achieve an "All-Switzerland settlement." The defendants support their interpretation with an account of the negotiating history of the clause. In their view, the exclusions were added at the request of the plaintiffs, and, according to the Swiss Banks defendants, the purpose of the exclusion was to prevent the Settlement Agreement from releasing from liability those Axis-based companies that had set up Swiss fronts to hide their assets. As we understand the defendants' reading, Exclusion I merely clarifies and reinforces that certain classes of corporate entities are not enumerated as Releasees.[6] They assert that Exclusion II carves out an exception by disqualifying a set of corporate entities that would otherwise receive releases. They contend that Exclusion II provides that even if a company meets the definition of an Owned or Controlled Affiliate — and thus would be generally entitled to a release — Exclusion II prevents the company from receiving a release if its Swiss parent company was established solely to hide assets. In other words, the Swiss Banks contend that the parties never intended to exclude all after-acquired affiliates from receiving releases when they added Exclusions I and II. In fact, the Swiss Banks defendants claim that after-acquired affiliates are generally entitled to a release as long as they were Owned or Controlled Affiliates as of October 3, 1996 — the date set forth for determining whether a company qualifies as a "Swiss-based Concern."
 
 
 26
 We do not see how the plain language of these dense and difficult provisions can settle this dispute. Plausible, alternative readings of the Releasee section of the Settlement Agreement support the interpretations of both the District Court and the Swiss Banks defendants. In short, the Settlement Agreement is ambiguous as to whether Axis-based companies are required to have been Owned or Controlled Affiliates during the Second World War, and thus ambiguous as to whether after-acquired affiliates of Swiss companies may qualify as Owned or Controlled Affiliates for release.
 
 
 27
 At oral argument, counsel for plaintiffs-appellees conceded the ambiguity of the settlement provisions in question: "There is at a minimum, I hope the Court would agree, a serious ambiguity in dealing with this language" (emphasis added). At another point, counsel stated: "There are more—there's more than one way to read this, you're absolutely right.... [W]e could read this five different ways, because the language that was negotiated under the crucible of a great deal of pressure is far from exact." At a third point, he admitted: "[T]here isn't a single right way to read it."
 
 
 28
 Under New York law, if the meaning of a given contract provision is found to be ambiguous, a court is empowered to consider extrinsic evidence. See Stage Club Corp. v. W. Realty Co., 212 A.D.2d 458, 622 N.Y.S.2d 948, 950-951 (1st Dep't 1995). We conclude that the provisions of the Settlement Agreement in question are indeed ambiguous. The District Court grounded its interpretation of the provisions upon the asserted plain meaning of the text. In the April 4, 2001 order, the District Court concluded that "[t]he defendants' argument ... essentially involves altering the clear language defining excluded releases." In re Holocaust Victim Assets Litig., No. 96-4849, 2001 WL 419967, at *3 (emphasis added). At another point in the April 4, 2001 Order, the District Court stated: "The negotiating history to which the defendants allude is not sufficient to override the plain language of the agreement." Id. at *4 (emphasis added). Yet, the District Court also candidly admits that "the negotiating history, at best, sends conflicting signals." Id.
 
 
 29
 In his letter of December 19, 2000 to the District Court, counsel for the Swiss Banks defendants outlined a basic version of the negotiating history. The letter stated that the parties had agreed at a negotiating session that no release would be given in a case "where the putative `Owned or Controlled Affiliate' came within the definition of `Owned or Controlled Affiliate' solely by virtue of its affiliation with a `Swiss-based concern' that had been established in order to cloak the putative affiliate." Letter of Roger M. Witten to the District Court, dated December 19, 2000, at 3. We do not have an outline of the negotiating history from plaintiffs. Moreover, there does not appear to have been a full exploration of the negotiating history, including the intention of the parties, in the District Court through submission of extrinsic evidence, such as live testimony, depositions, or affidavits. Accordingly, we vacate and remand the judgment of the District Court insofar as it concerns the issue of the Swiss-ownership requirement for further proceedings consistent with this opinion.
 
 III
 
 30
 We are mindful of the oft-repeated, and oft-recognized, need for relative speed in the resolution of these cases, and we commend Chief Judge Korman, and counsel for both sides, for the careful and prompt way in which they have sought to bring these cases to a conclusion. We are confident that the parties and Chief Judge Korman will be able to address the remaining questions with the same care and promptness they have shown in the past.
 
 
 31
 For the reasons stated above, the appeal is dismissed insofar as it concerns the challenge of the Swiss Banks defendants to the incorporation of a self-identification requirement for Swiss corporate entities seeking release under Slave Labor Class II and the order of the District Court is vacated and remanded insofar as it concerns the issue of the Swiss-ownership requirement.
 
 
 
 Notes:
 
 
 [1]
 The complete definition of Slave Labor Class II is as follows:
 Slave Labor Class II consists of individuals who actually or allegedly performed Slave Labor at any facility or work site, wherever located, actually or allegedly owned, controlled, or operated by any corporation or other business concern headquartered, organized, or based in Switzerland or any affiliate thereof, and the individuals' heirs, executors, administrators, and assigns, and who have or at any time have asserted, assert, or may in the future seek to assert Claims against any Releasee other than Settling Defendants, the Swiss National Bank, and Other Swiss Banks for relief of any kind whatsoever relating to or arising in any way from such Slave Labor or Cloaked Assets or any effort to obtain redress in connection with Slave Labor or Cloaked Assets.
 Settlement Agreem. at 15-16.
 
 
 [2]
 We note that counsel for plaintiffs also characterizes defendants' December 19, 2000 letter "as a request for reconsideration under Rule 60(b)." Letter of Burt Neuborne to the panel, dated January 23, 2002
 
 
 [3]
 Federal Rule of Appellate Procedure 4(a)(4)(A)(vi) states in relevant part:
 If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:
 ...
 (vi) for relief under Rule 60 if the motion is filed no later than 10 days (computed using Federal Rule of Civil Procedure 6(a)) after the judgment is entered.
 Fed.R.App.P. 4(a)(4)(A)(vi).
 
 
 [4]
 The Settlement Agreement defines Releasees, in relevant part, as follows:
 Releasees means the Settling Defendants; the Swiss National Bank; Other Swiss Banks; the Swiss Bankers Association; the Swiss Confederation (including, without limitation, the Cantons and all other political subdivisions and governmental instrumentalities in Switzerland); all business concerns (whether organized as corporations or otherwise) headquartered, organized, or incorporated in Switzerland as of October 3, 1996, including, without limitation, corporations incorporated in Switzerland that are owned, operated, or controlled directly or indirectly by corporations located outside Switzerland ("the Swissbased Concerns") and their branches and offices, wherever located; and all affiliates of any Swiss-based Concern (whether organized as corporations, partnerships, sole proprietorships or otherwise) wherever headquartered, organized, or incorporated in which the Swiss-based Concern owns or controls directly or indirectly at least 25 percent of any class of voting securities or controls in any manner the election or appointment of a majority of the board of directors, trustees or similar body ("Owned or Controlled Affiliates"). As to each of the foregoing Releasees, the term Releasees also includes, without limitation, each of its predecessors, successors, assigns, officers, directors, employees, agents, attorneys, heirs, executors, administrators, and personal representatives wherever located.
 Settlement Agreem. at 6.
 
 
 [5]
 The Settlement Agreement defines "Owned or Controlled Affiliates" as
 [A]ll affiliates of any Swiss-based Concern (whether organized as corporations, partnerships, sole proprietorships or otherwise) wherever headquartered, organized, or incorporated in which the Swiss-based Concern owns or controls directly or indirectly at least 25 percent of any class of voting securities or controls in any manner the election or appointment of a majority of the board of directors, trustees or similar body....
 Settlement Agreem. at 6.
 
 
 [6]
 Parent companies and other affiliates of Swiss-based Concerns, the two classes of corporate entities subject to Exclusion I, are not in and of themselves enumerated as Releasees in the Settlement Agreement. In that sense, Exclusion I is not necessary except to clarify that the list of enumerated Releasees is defined